TYSON, Judge.
*119 Plaintiffs' appeal asserts the trial court erred in concluding, as a matter of law, that payments specified in an agreement between the Attorney General of North Carolina and Smithfield Foods, Inc., and its subsidiaries are not civil penalties required to be used to fund public education pursuant to Article IX, § 7 of the North Carolina Constitution. The trial court's order granting the defendant's motion for summary judgment and denying the plaintiffs' cross-motion for summary judgment is reversed in part and remanded for trial.
I. Background
On 25 July 2000, Michael F. Easley, in his capacity as Attorney General of North Carolina, entered into an agreement (the "Agreement") with Smithfield Foods, Inc. ("Smithfield") and several of its subsidiaries, *120 Brown's of Carolina, Inc., Carroll's Foods, Inc., Murphy Farms, Inc., Carroll's Foods of Virginia, Inc., and Quarter M Farms, Inc. (collectively, the "Companies"). *91 Daniel Oakley, the former Division Director of the North Carolina Department of Justice's Environmental Division at the time the Agreement was negotiated and entered into, stated in an affidavit:
The background for the [Agreement] was a five-year period of time, from 1995 to 2000, when ruptured or flooded swine waste lagoons, not all of them Smithfield's, had spilled millions of gallons of waste into North Carolina waterways, contaminating surface waters and killing aquatic life, while seepage from waste lagoons impacted groundwater supplies.
In the Agreement, the Department of Environmental Quality is referred to under its previous name of the Department of Environment and Natural Resources, or DENR. As of 1 July 2015, the agency was formally renamed the North Carolina Department of Environmental Quality. 2015 S.L. 241, § 14.30.(c), eff. July 1, 2015. We refer to the agency throughout this opinion under its current name of the Department of Environmental Quality ("DEQ").
Under the terms of the Agreement, the Companies entered into it for the purpose of undertaking "a series of environmental initiatives intended to preserve and enhance water quality in eastern North Carolina." To support "environmental initiatives," the Companies agreed to commit funds to "environmental enhancement activities." The Agreement specified these funds would be "paid to such organizations or trusts as the Attorney General will designate. The funds will be used to enhance the environment of the State, including eastern North Carolina, to obtain environmental easements, construct or maintain wetlands and such other environmental purposes, as the Attorney General deems appropriate."
In the Agreement, the Companies committed, among other things, to "pay each year for 25 years an amount equal to one dollar for each hog in which the Companies ... have had any financial interest in North Carolina during the previous year, provided, ... that such amount shall not exceed $2 million in any year." To facilitate these payments, the Companies maintain an escrow account into which funds are deposited. The Attorney General maintains the sole authority to direct the escrow agent to disburse funds to grant recipients, who are chosen by the Attorney General.
*121 Under the Agreement, the Attorney General may consult with the Companies, DEQ, and "any other groups or individuals he deems appropriate and may appoint any advisory committees he deems appropriate[,]" in administering the grant program.
To facilitate the administration of the funds in escrow, the Attorney General established the Environmental Enhancement Grant Program ("EEG Program"). Every year since the Agreement was established, the Attorney General has received proposals from governmental agencies and nonprofit organizations to receive Environmental Enhancement Grants ("EEGs"). A panel consisting of representatives from the Department of Justice, DEQ, the North Carolina Department of Natural and Cultural Resources, academic institutions, and environmental nonprofit organizations reviews the EEG proposals and makes recommendations to the Attorney General. Representatives from Smithfield could also submit recommendations separate from the panel.
The Attorney General exercises sole discretion over the selection of grant recipients and approval of the amounts awarded, up to a maximum of $500,000 per award. After the Attorney General selects the grant recipients, the funds are distributed as reimbursements for expenses already incurred by the grant recipients. The Attorney General has awarded grants totaling more than $24 million since the Agreement was signed.
On 18 October 2016, Francis X. De Luca ("De Luca"), a citizen and resident of Wake County, North Carolina, filed a complaint against the Attorney General of North Carolina, Roy Cooper, in his official capacity. In his complaint, De Luca sought a preliminary and permanent injunction to prevent the Attorney General from distributing monies paid under the Agreement to any entities other than to the State's Civil Penalty and Forfeiture Fund.
The Attorney General filed a motion to dismiss on 19 December 2016. On 25 January *92 2017, while the motion to dismiss was pending, De Luca filed an amended complaint, which added the New Hanover County Board of Education ("NHCBE") as a party-plaintiff. Joshua H. Stein ("the Attorney General"), in his official capacity as the current Attorney General of North Carolina, was substituted as the defendant. The Attorney General subsequently filed an amended motion to dismiss.
On 14 June 2017 and 16 June 2017, respectively, De Luca and the NHCBE (collectively, "Plaintiffs") filed a motion for preliminary injunction and a motion for summary judgment. The trial court heard *122 Plaintiffs' motion for preliminary injunction and the Attorney General's amended motion to dismiss on 27 June 2017.
The trial court denied the Attorney General's motion to dismiss and granted Plaintiffs' request for a preliminary injunction, based upon the court's finding that Plaintiffs were "likely to prevail" and "the public interest favors the granting of a preliminary injunction." The Attorney General filed an answer to the amended complaint on 17 July 2017. On 21 July 2017, upon consent of the parties, an amended injunction was entered to clarify the preliminary injunction would only apply to grants awarded after 30 September 2016.
On 21 August 2017, two environmental organizations, who had previously received grants under the Agreement, the North Carolina Coastal Federation, Inc. and Sound Rivers, Inc. (collectively, "Intervenors"), filed a motion to intervene. On 22 September 2017, Plaintiffs served their opposition to the motion to intervene and renewed their motion for summary judgment. The same day, the Attorney General filed a motion for summary judgment. On 28 September 2017, the Intervenors filed a motion for leave to file a memorandum of law in support of the Attorney General's motion for summary judgment, and the North Carolina School Boards Association ("NCSBA") filed a motion for leave to file an amicus curiae brief in support of Plaintiffs' motion for summary judgment.
The parties' cross-motions for summary judgment, Intervenors' motion to intervene, and NCSBA's motion for leave to file an amicus brief were heard by the trial court on 5 October 2017. On 12 October 2017, the trial court entered its order, which granted the Attorney General's motion for summary judgment, denied Plaintiffs' motion for summary judgment, dismissed Plaintiffs' complaint with prejudice, and dissolved the preliminary injunction previously entered by the trial court. The trial court also entered orders granting Intervenors' motion to intervene and NCSBA's motion for leave to file an amicus brief. On appeal, Plaintiffs do not challenge the trial court's order, to the extent it granted Intervenors' motion to intervene.
From the trial court's order granting the Attorney General's motion for summary judgment and denying their motion for summary judgment, Plaintiffs filed timely notice of appeal on 25 October 2017.
II. Jurisdiction
Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7A-27(b) (2017) as an appeal from a final judgment of the superior court.
*123 III. Standard of Review
"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [a] party is entitled to judgment as a matter of law." Summey v. Barker , 357 N.C. 492, 496, 586 S.E.2d 247, 249 (2003) (citation and internal quotation marks omitted); see N.C. Gen. Stat. § 1A-1, Rule 56(c).
A defendant may show entitlement to summary judgment by (1) proving that an essential element of the plaintiff's case is non-existent, or (2) showing through discovery that the plaintiff cannot produce evidence to support an essential element of his or her claim, or (3) showing that the plaintiff cannot surmount an affirmative defense. Summary judgment is not appropriate where matters of credibility and determining the weight of the evidence exist.
Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *93 prima facie case at trial. To hold otherwise ... would be to allow plaintiffs to rest on their pleadings, effectively neutralizing the useful and efficient procedural tool of summary judgment.
Draughon v. Harnett Cty. Bd. of Educ. , 158 N.C. App. 208, 212, 580 S.E.2d 732, 735 (2003) (citations and quotation marks omitted), aff'd per curiam , 358 N.C. 131, 591 S.E.2d 521 (2004).
"Our standard of review of an appeal from summary judgment is de novo [.]" In re Will of Jones , 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (quoting Forbis v. Neal , 361 N.C. 519, 523-24, 649 S.E.2d 382, 385 (2007) ). "The evidence produced by the parties is viewed in the light most favorable to the non-moving party." Hardin v. KCS Int'l., Inc. , 199 N.C. App. 687, 695, 682 S.E.2d 726, 733 (2009) (citation omitted). "If the evidentiary materials filed by the parties indicate that a genuine issue of material fact does exist, the motion for summary judgment must be denied." Vernon, Vernon, Wooten, Brown & Andrews, P.A. v. Miller , 73 N.C. App. 295, 298, 326 S.E.2d 316, 319 (1985).
Here, both parties moved for summary judgment and assert no genuine issues of material fact exist. Under our de novo review of an order granting summary judgment, we are not bound by the trial court's *124 conclusion or the parties' contention that no genuine issues of material fact exist. See MCC Outdoor, LLC v. Town of Wake Forest , 222 N.C. App. 70, 75, 729 S.E.2d 694, 697 (2012) (denying summary judgment on both the plaintiff's and the defendant's motions after determining genuine issues of material fact existed).
IV. Analysis
A. Standing
Intervenors argue Plaintiffs do not have standing to bring suit over the grant funds provided in the Agreement. Standing refers to "a party's right to have a court decide the merits of a dispute[,]" and provides the courts of this State subject matter jurisdiction to hear a party's claims. Teague v. Bayer AG , 195 N.C. App. 18, 23, 671 S.E.2d 550, 554 (citation and internal quotation marks omitted).
"[S]tanding is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction and can be challenged at any stage of the proceedings, even after judgment." Willowmere Cmty. Ass'n, Inc. v. City of Charlotte , 370 N.C. 553, 561, 809 S.E.2d 558, 563-64 (2018) (internal quotation marks and citations omitted). "Standing is jurisdictional in nature and consequently, standing is a threshold issue that must be addressed, and found to exist, before the merits of the case are judicially resolved." In re Miller , 162 N.C. App. 355, 357, 590 S.E.2d 864, 865 (2004).
Standing is a question of law which this Court reviews de novo . Neuse River Found., Inc. v. Smithfield Foods, Inc. , 155 N.C. App. 110, 114, 574 S.E.2d 48, 51 (2002), disc. review denied , 356 N.C. 675, 577 S.E.2d 628 (2003).
The Attorney General initially asserted De Luca lacked standing in a Rule 12(b)(6) motion to dismiss. The trial court ruled De Luca and NHCBE had standing in its 14 July 2017 order granting Plaintiffs' request for a preliminary injunction. The Attorney General subsequently reasserted Plaintiffs' lack of standing in a brief in support of his motion for summary judgment. The trial court expressly declined to revisit the issue of standing in its 12 October 2017 order, which granted Defendants' motion for summary judgment. The trial court's order states:
In a prior order of the Superior Court, the Honorable Robert Hobgood presiding, the Court found that Plaintiffs DeLuca and the New Hanover Board of Education each had standing. Although Defendant raises this issue anew *125 in arguing the current motion, the prior order of the Court will not be revisited by the undersigned.
Intervenors, but not the Attorney General, argue on appeal that the Plaintiffs lack standing. Neither the Attorney General nor the Intervenors appealed from the trial court's earlier order in which it concluded Plaintiffs each had standing. Nevertheless "[s]tanding is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction,"
*94 Aubin v. Susi , 149 N.C. App. 320, 324, 560 S.E.2d 875, 878-79, disc. review denied , 356 N.C. 610, 574 S.E.2d 474 (2002), and "[a] challenge to subject matter jurisdiction may be made at any time." Whittaker v. Furniture Factory Outlet Shops , 145 N.C. App. 169, 172, 550 S.E.2d 822, 824 (2001) (citations, quotation marks, and ellipses in original omitted). Because, "subject matter jurisdiction may not be waived, and this Court has not only the power, but the duty to address the trial court's subject matter jurisdiction[,]" we address Intervenors arguments concerning standing. Rinna v. Steven B. , 201 N.C. App. 532, 537, 687 S.E.2d 496, 500 (2009).
1. De Luca's Standing
With regard to Plaintiff De Luca, Intervenors argue De Luca's standing as a taxpayer is "limited to challenges against the government for misuse or misappropriation of public funds ." (Emphasis original). Intervenors contend this case does not involve public or taxpayer funds because the grant funding at issue is provided by private companies. This Court addressed the question of taxpayer standing to bring suit under Article IX, § 7 of the North Carolina Constitution in Fuller v. Easley , 145 N.C. App. 391, 553 S.E.2d 43 (2001).
In Fuller , the plaintiff brought an action against then Attorney General Easley, alleging the Attorney General had improperly diverted proceeds from numerous lawsuits to a "public service message campaign." Fuller , 145 N.C. App. at 393-94, 553 S.E.2d at 45-46. The plaintiff alleged the lawsuit proceeds were required to be used to fund public education pursuant to Article IX, § 7 of the State Constitution. Id. at 396, 553 S.E.2d at 47. The plaintiff brought the suit in his capacity as a taxpayer of Wake County. Id. at 395, 553 S.E.2d at 46. The trial court dismissed the plaintiff's complaint for reasons unspecified in its order. Id. at 394, 553 S.E.2d at 46.
On appeal, the plaintiff argued the trial court improperly dismissed his complaint, in part, for lack of standing. Id. In addressing the plaintiff's arguments, this Court recited the rules regarding taxpayer standing, as follows:
*126 Generally, an individual taxpayer has no standing to bring a suit in the public interest. Green v. Eure, Secretary of State , 27 N.C. App. 605, 608, 220 S.E.2d 102, 105 (1975). However, the taxpayer may have standing if he can demonstrate:
[A] tax levied upon him is for an unconstitutional, illegal or unauthorized purpose[;] that the carrying out of [a] challenged provision will cause him to sustain personally, a direct and irreparable injury[;] or that he is a member of the class prejudiced by the operation of [a] statute.
Texfi Industries v. City of Fayetteville , 44 N.C. App. 268, 270, 261 S.E.2d 21, 23 (1979) (citations omitted). Our review of plaintiff's complaint reveals no allegations which allow him to sue as an individual taxpayer.
Nonetheless, plaintiff may have had standing to bring a taxpayer action, not as an individual taxpayer, but on behalf of a public agency or political subdivision, if " 'the proper authorities neglect[ed] or refus[ed] to act.' " Guilford County Bd. of Comrs. v. Trogdon , 124 N.C. App. 741, 747, 478 S.E.2d 643, 647 (1996) (quoting Branch v. Board of Education , 233 N.C. 623, 625, 65 S.E.2d 124, 126 (1951) ). To establish standing to bring an action on behalf of public agencies and political divisions, a taxpayer must allege
that he is a taxpayer of [that particular] public agency or political subdivision, ... [and either,] "(1) there has been a demand on and refusal by the proper authorities to institute proceedings for the protection of the interests of the political agency or political subdivision; or (2) a demand on such authorities would be useless."
Id . (citation omitted).
Id. at 395-96, 553 S.E.2d at 46-47. This Court concluded the plaintiff in Fuller lacked standing because he had "failed to allege that the Wake County Board of Education or any other Board of Education refused to bring a suit to recover funds, that he requested the Board do so, or that such a request would be futile." Id. at 396, 553 S.E.2d at 47.
*95 Upon reviewing Plaintiffs' complaint, Plaintiffs have failed to allege any basis upon which De Luca may sue solely upon his capacity as a *127 taxpayer. De Luca has not alleged that: (1) the payments at issue constitute an illegal or unconstitutional tax; (2) the Agreement has caused him a personal, direct, and irreparable injury; or, (3) he is a member of a class prejudiced by the Agreement. See Texfi , 44 N.C. App. at 270, 261 S.E.2d at 23.
De Luca's complaint also fails to allege he had made any demand upon proper authorities to bring suit, or that such a demand would be futile or useless. See Trogdon , 124 N.C. App. at 747, 478 S.E.2d at 647. Under our precedents, De Luca has not alleged a basis to sustain his standing to challenge the Attorney General's alleged violation of Article IX, § 7 of our State Constitution. See Fuller , at 394, 553 S.E.2d at 46.
2. NHCBE's Standing
Intervenors also argue NHCBE does not have standing because it has not demonstrated "any injury in fact from the creation or execution of the Smithfield Agreement" and "[n]either plaintiff has presented any evidence to support a claim that the Agreement has deprived them of payments to which they are entitled." We disagree.
Taking the allegations in Plaintiffs' amended complaint as true and the monies paid by the Companies under the Agreement as penalties, then NHCBE would be an intended beneficiary of a portion of those monies under Article IX, § 7 of the State Constitution and under N.C. Gen. Stat. § 115C-457.2 (2017), which requires all "civil penalties, civil forfeitures, and civil fines" to be placed in the Civil Penalty and Forfeiture Fund for the benefit of the public schools.
Intervenors argument that NHCBE has failed to demonstrate standing is dependent upon viewing the allegations in Plaintiffs' amended complaint in light of the evidence in the record. However, whether a party has standing
is determined at the time of the filing of a complaint. "Our courts have repeatedly held that standing is measured at the time the pleadings are filed. The Supreme Court has explained that '[w]hen standing is questioned, the proper inquiry is whether an actual controversy existed' when the party filed the relevant pleading." Quesinberry v. Quesinberry , [196 N.C. App. 118, 123], 674 S.E.2d 775, 778 (2009) (citation omitted).
Metcalf v. Black Dog Realty, LLC , 200 N.C. App. 619, 625, 684 S.E.2d 709, 714 (2009).
*128 Viewing the allegations in Plaintiffs' complaint in the light most favorable to NHCBE, NHCBE would be an intended beneficiary of the monies the Companies have paid or are obligated to pay under the Agreement pursuant to Article IX, § 7 of the State Constitution. NHCBE has alleged that they have been deprived of money to which they are constitutionally entitled, and have consequently alleged an injury in fact. NHCBE has standing to maintain this action against the Attorney General and Intervenors. Intervenors' arguments are overruled.
B. N.C. Constitution Article IX, § 7
Plaintiffs and the NCSBA argue the trial court erred in granting the Attorney General's motion for summary judgment, and denying Plaintiffs' motion, because the monies paid by the Companies under the Agreement are "penalties" pursuant to Article IX, § 7 of the North Carolina Constitution, as a matter of law. N.C. Const. art. IX, § 7.
Article IX, § 7 mandates "the clear proceeds of all penalties and forfeitures and of all fines collected in the several counties for any breach of the penal laws of the State, shall belong to and remain in the several counties, and shall be faithfully appropriated and used exclusively for maintaining free public schools." N.C. Const. art. IX, § 7 (a). Supplementing funding for public schools with proceeds from "penalties, forfeitures, and fines" as unbudgeted, non-recurring sources of revenue reflects North Carolina's stated and strong public policy to support public education. See generally David M. Lawrence, Fines, Penalties, and Forfeitures: An Historical and Comparative Analysis , 65 N.C. L. Rev. 49, 54-59 (1986).
The general statutes mandate that the proceeds of penalties and other monies within the scope of Article IX, § 7 must be remitted *96 by the collecting agency to the Office of State Management and Budget in order for the proceeds to be deposited in the State's Civil Penalty and Forfeiture Fund. N.C. Gen. Stat. §§ 115C-457.2, -457.3 (2017).
The Supreme Court of North Carolina has defined a "penalty" to be an amount collected under a "penal law[ ]," or a "law[ ] that impose[s] a monetary payment for [its] violation [where] [t]he payment is punitive rather than remedial in nature and is intended to penalize the wrongdoer rather than compensate a particular party." Mussallam v. Mussallam, 321 N.C. 504, 509, 364 S.E.2d 364, 366-67 (emphasis supplied), reh'g denied, 322 N.C. 116, 367 S.E.2d 915 (1988).
"[A]n assessment is a penalty or a fine if it is 'imposed to deter future violations and to extract retribution from the violator ' for his illegal *129 behavior." Shavitz v. City of High Point , 177 N.C. App. 465, 475, 630 S.E.2d 4, 12 (2006) (emphasis supplied) (quoting N.C. School Bds. Ass'n v. Moore, 359 N.C. 474, 496, 614 S.E.2d 504, 517 (2005) ).
1. Civil Penalties
Plaintiffs and NCSBA assert our Supreme Court's holdings in Craven County Bd. of Education v. Boyles , 343 N.C. 87, 468 S.E.2d 50 (1996), and Moore , 359 N.C. 474, 614 S.E.2d 504, support their arguments that the monies paid pursuant to the Agreement are civil "penalties" and are required to be remitted to the Civil Penalty and Forfeiture Fund. The Attorney General and Intervenors argue the monies paid under the Agreement are not "penalties" because the payments were made "voluntarily" by the Companies, and were not intended to penalize the Companies for any environmental violations "or to deter future violations." See Shavitz , 177 N.C. App. at 475, 630 S.E.2d at 12. We disagree.
In Moore , the City of Kinston had been cited for environmental violations. 359 N.C. at 507-08, 614 S.E.2d at 524. The City of Kinston entered into a settlement agreement with DEQ, under which it agreed to fund a "Supplemental Environmental Project" in lieu of paying a civil penalty. Id. DEQ had established Supplemental Environmental Projects as an alternative enforcement mechanism under which environmental violators would agree to fund "projects that are beneficial to the environment and/or to public health" as part of settlements to enforcement actions. Id. at 508, 614 S.E.2d at 525, 359 N.C. 474.
The Supreme Court of North Carolina considered whether the monies paid by the City of Kinston to fund a Supplemental Environmental Project were subject to Article IX, § 7 of our State Constitution. Id. at 507-08, 614 S.E.2d at 524, 359 N.C. 474. The Court concluded the monies at issue were subject to Article IX, § 7, in part because:
The payment would not have been made had [DEQ] not assessed a civil penalty against [the violator] for violating a water quality law. To suggest that the payment was voluntary is euphemistic at best. Moreover, the money paid under the [Supplemental Environmental Project] did not remediate the specific harm or damage caused by the violation even though a nexus may exist between the violation and the program [funded by the payment.]
Id. at 509, 614 S.E.2d at 525 (emphasis supplied).
In Boyles , a company had been formally assessed a civil penalty by DEQ of $1,466,942.44. Boyles , 343 N.C. at 88, 468 S.E.2d at 51. The *130 company sought administrative review of the penalty in the Office of Administrative Hearings. Before the matter was adjudicated, the parties settled. Id. The settlement required the company to pay $926,000, but recited that the vast majority of this amount was not a penalty, but instead was made to redress harm to the environment. Id. at 88-89, 468 S.E.2d at 51, 343 N.C. 87. Despite DEQ and the company explicitly specifying the settlement amount to not be a penalty, our Supreme Court had determined the settlement payments were "covered by Article IX, Section 7." Id. at 91, 468 S.E.2d at 52, 343 N.C. 87.
The Court based its determination primarily upon the fact the company had "entered into a settlement agreement" with DEQ "after the department found that the company had violated state environmental standards and assessed a civil penalty against" the company "for violation of those standards." Id.
*97 The company had subsequently "filed for a contested [case] hearing and then settled with the department in lieu of contesting the civil penalty that had been assessed." Id . The payments fell within the scope of Article IX, § 7 because they were "paid because of a civil penalty assessed against" the company. Id. (emphasis supplied).
2. Genuine Issues of Material Fact
To support their assertions that the monies the Companies agreed to pay under the Agreement before us are not penalties, the Attorney General refers to several affidavits submitted in support of his motion for summary judgment. In the affidavit of Alan Hirsch, he averred that negotiations of the Agreement were initiated in 1999 by Hirsch, the then Director of the Consumer Protection Division of the North Carolina Department of Justice under the direct authority of the Attorney General.
Hirsch and representatives of the Companies took approximately eight months to negotiate the Agreement. Attorneys from the Department of Justice's Environmental Division were also involved throughout the negotiation process, purportedly "[t]o be certain that there was nothing in the language of the draft agreement that could be read to limit or affect in any way the compliance responsibilities of [DEQ]."
Hirsch averred "the Agreement was not reached in order to settle any cases in which a civil penalty had been issued or might later be issued[,]" and "[t]he Agreement did not arise from or address any actual or alleged violations of law or regulation on the part of Smithfield. No penalties or punitive action of any sort was ever discussed or considered. The Agreement was not, and is not, punitive."
Regarding the Companies reasons for entering the Agreement, Hirsch stated:
*131 9. I believe the purpose from Smithfield's perspective was to solve a long running problem of major public concern, to demonstrate good corporate citizenship by working towards better waste management solutions, and to further its public standing by making additional enhancements of North Carolina's environment. The image of the industry was under intense scrutiny by the press, citizens and the General Assembly, all a matter of great concern to the industry.
Daniel Oakley stated in his affidavit:
21. As a primary negotiator of [the Agreement], ... I know that the [Agreement] was not reached in order to settle any cases in which a civil penalty had been assessed by [DEQ]. As Director of the Environmental Division, I know that no civil penalty being defended by attorneys in my Division was settled, compromised, or in any way impacted by the negotiation or execution of the [Agreement].
...
24. Although there were Notices of Violation and Civil Penalty Assessments issued to various hog farms from 1995 to 2001, any Civil Penalty Assessments were resolved by other means and were not part of the Agreement at issue in this case.
The sworn attestations in these affidavits purport the payments the Companies undertook to pay under the Agreement are not punitive because they did not resolve any past, present, or future violations of environmental laws. Nonetheless, several factors in the record raise genuine issues of material fact regarding whether the payments were "intended to penalize" the Companies or were "imposed to deter future violations and to extract retribution from" the Companies. Mussallam , 321 N.C. at 509, 364 S.E.2d at 367 ; Moore , 359 N.C. at 496, 614 S.E.2d at 517.
First, it is undisputed by the parties that the negotiating and consummating of the Agreement was instigated at the behest of and initiated by the Attorney General's office, and not by the Companies. If the Agreement was purportedly sought or undertaken by the Companies to "demonstrate good corporate citizenship" and to "improve the image" of the hog farming industry, as attested to by Alan Hirsch, and not to penalize the Companies for environmental or other legal violations or coerce the Companies' compliance with such laws, a genuine issue of *132 material fact exists regarding why the impetus for the Agreement was instigated from the office *98 of the Attorney General, the chief law enforcement officer of the State, and not from DEQ or the Companies, or why the Attorney General retains sole authority over the disbursements of the funds. See In re Investigation by Attorney General , 30 N.C. App. 585, 589, 227 S.E.2d 645, 648 (1976) ("The Attorney General is ... the State's chief law enforcement officer").
Second, the basis, formula, and manner in which the amounts are calculated for the Companies to pay each year under the Agreement are apparently based more in penalties, or a "head tax" calculation, rather than "voluntary contributions" designed to enhance the Companies' "good corporate citizenship," images or goodwill, and created issues of fact. The Agreement specifically provides:
The Companies agree to pay each year for 25 years an amount equal to one dollar for each hog in which the Companies (including, for such purpose, any successor-in-interest of any of the Companies, by merger, sale of stock or assets or otherwise) have had any financial interest in North Carolina during the previous year, provided, however, that such amount shall not exceed $2 million in any year. For purposes of this paragraph, the Companies have a financial interest in any hog that, inter alia, they (or their nonparty subsidiaries or affiliates) raise, produce, contract for, own or slaughter.
The record does not disclose the reasoning upon which the Companies agreed to pay the annual amount of $1-per-hog for 25 years. If the Companies were purely motivated out of a desire to further their corporate image, as the Attorney General contends, it is not apparent why they would agree to pay $1-per-hog over 25 years as opposed to a specific lump sum or stated contribution.
We note that the per-hog payments specified under the Agreement bears a resemblance to the per-cigarette payments the General Assembly enacted in the late 1990s to implement the Master Settlement Agreement with tobacco manufacturers to settle lawsuits filed by several states' Attorneys General, including Attorney General Easley, over healthcare costs stemming from tobacco use.
In November 1998, North Carolina and forty-five other states signed a Master Settlement Agreement (MSA) with four major tobacco manufacturers for the purpose of settling claims that North Carolina could have otherwise *133 asserted against those manufacturers arising from smoking-related health care costs incurred by the State as a result of the consumption of the major manufacturers' products. The General Assembly enacted a series of statutory provisions entitled the Tobacco Reserve Fund and Escrow Compliance Act (Act) in July, 1999 in order to effectuate the MSA. Pursuant to that legislation, all cigarette manufacturers doing business in North Carolina were made subject to N.C. Gen. Stat. § 66-291, which required them to choose between either (1) participating in the MSA or (2) paying certain specified sums, computed on the basis of the quantities of cigarettes sold by April 15 of each year, into a special fund . See State ex rel. Cooper v. Ridgeway Brands Mfg., LLC, 362 N.C. 431, 433, 666 S.E.2d 107, 109 (2008). More specifically, N.C. Gen. Stat. § 66-291 provides that:
(a) Any tobacco product manufacturer selling cigarettes to consumers within the State (whether directly or through a distributor, retailer, or similar intermediary or intermediaries) after the effective date of this Article shall do one of the following:
(1) Become a participating manufacturer (as that term is defined in section II(jj) of the Master Settlement Agreement) and generally perform its financial obligations under the Master Settlement Agreement; or
(2) Place into a qualified escrow fund by April 15 of the year following the year in question the following amounts (as such amounts are adjusted for inflation): ....
[e. For each of 2007 and each year thereafter: $.0188482 per unit sold.]
N.C. Gen. Stat. § 66-291(a). The funds placed in escrow pursuant to N.C. Gen. Stat. § 66-291(a)(2) are intended to provide a source from which any judgment for reimbursement of medical costs obtained *99 by the State against a nonparticipating manufacturer resulting from the consumption of cigarettes produced by that nonparticipating manufacturer can be satisfied.
State ex rel. Cooper v. Seneca-Cayuga Tobacco Co. , 197 N.C. App. 176, 177-78, 676 S.E.2d 579, 581 (2009) (emphasis supplied) (citing N.C. Gen. Stat. § 66-291(a) ).
*134 Under the MSA:
In return for the states dropping their suits against the four companies, the companies agreed to pay the states $206 billion over twenty-five years. Thereafter, payments were to continue to be based on the quantity of cigarette sales of each company. Payment was made as compensation for the additional cost that state Medicaid programs had allegedly incurred for treatment of Medicaid recipients with smoking-related diseases and as a penalty for deceptive trade practices of the companies.
Frank Sloan & Lindsey Chepke, Litigation, Settlement, and the Public Welfare: Lessons from the Master Settlement Agreement , 17 Widener L. Rev. 159, 161 (2011).
Unlike the tobacco MSA, the Attorney General and Intervenors contend the Agreement with the Companies before us is not a settlement agreement, as it purportedly did not "settle" any legal claims. However, a genuine issue of material fact exists of whether the Agreement was motivated by a desire by the Companies to forestall, or forebear, any potential claims the Attorney General or DEQ could have asserted against them.
If so, an issue of fact exists of whether the Companies would not have agreed to make the payments at issue, but for potential legal claims, and consequent civil penalties or fines, the Attorney General could have asserted against them. See Moore , 359 N.C. at 509, 614 S.E.2d at 525 (holding, in part, that a payment made by the City of Kinston to fund environmental programs in lieu of civil penalties asserted by DEQ was a penalty subject to Article IX, § 7 ).
The timing of enforcement actions taken against the Companies and subsequent facts also raise genuine issues of material fact with regard to whether the payments under the Agreement were intended to be punitive, or in lieu of enforcement actions asserted against the Companies. Records before the Court of DEQ enforcement actions against the Companies presented by Plaintiffs highlight that a number of the Companies had civil penalties assessed against them in the time period preceding and following the signing of the Agreement.
In the fourteen months preceding the signing of the Agreement, DEQ assessed nine civil penalties against the Companies for environmental violations. In the eight months following the signing of the Agreement, DEQ assessed nine additional penalties against the Companies. Eight *135 of these civil penalties were paid in full by the Companies, including six that were paid in full after the Agreement was signed. Seven penalties were settled for discounted amounts. Although the Companies paid many of these civil penalties after the Agreement was executed on 25 July 2000, all were for notices of violations accrued or issued by DEQ before the Agreement was executed. The record before us does not demonstrate DEQ issued any notices of violations to the Companies after the Agreement was signed.
This apparent discrepancy between the number of notices of violations issued to the Companies before and after the Agreement was signed raises genuine issues of material fact regarding whether the Attorney General, DEQ, and the Companies intended for the Agreement, and the payments specified therein, to be in lieu of further enforcement actions, and their related civil penalties, against the Companies. Whether these payments were "intended to penalize" the Companies or were "imposed ... to deter future violations and to extract retribution from" the Companies is an issue of fact, which remains to be resolved. Mussallam , 321 N.C. at 509, 364 S.E.2d at 366-67 ; Moore , 359 N.C. at 496, 614 S.E.2d at 517.
Another genuine issue of material fact, concerning whether the payments were intended to penalize the Companies, is also raised by the express terms of the Agreement. In addition to the commitment to pay up to $50 million for environmental enhancement activities, the Companies also committed *100 in the Agreement to implement plans to correct "deficient site conditions or operating practices" on properties and operations they owned. The Companies also committed to implement what the Agreement refers to as "Environmentally Superior Technologies." The Agreement specifies, "[i]mplementation will include the installation and operation of monitoring equipment and procedures needed to ensure compliance with applicable environmental standards , in accordance with the applicable permit conditions." (Emphasis supplied).
The question of why the Companies committed to undertake actions to remediate deficient conditions on their farms and operations, install equipment, and additionally pay up to $50 million raises the issue of whether the $50 million in additional payments was intended to penalize the Companies for non-compliance with environmental standards or to induce forbearance on the part of the Attorney General, or DEQ, in bringing future enforcement actions. This is especially pertinent in light of the Companies relinquishing any control over to whom and in what amounts the Attorney General distributes the environmental grants.
*136 Another genuine issue of material fact concerning whether these payments were intended to be penalties is raised by two official and public communications issued by the Attorney General's office in 2002 and 2013, respectively. Both of these communications expressly refer to the Agreement as a "settlement." Whether the Agreement is, in fact, a "settlement" is not ultimately determinative of whether the payments are penalties. See Boyles, 343 N.C. at 92, 468 S.E.2d at 53 (stating "it is not determinative that the monies were collected by virtue of a settlement agreement"). However, the Attorney General's reference to the Agreement as a "settlement" in these press releases raises a genuine issue of material fact of whether the parties intended for the Agreement, and the payments thereunder, to be in lieu of any potential claims or enforcement actions the Attorney General or DEQ could have brought against the Companies.
Based upon the genuine issues of material fact regarding whether these payments, instigated at the Attorney General's behest, were "intended to penalize" the Companies or were "imposed ... to deter future violations and to extract retribution from" the Companies, the superior court incorrectly concluded these payments constitute civil penalties as a matter of law.
V. Conclusion
Genuine issues of material fact exist to preclude summary judgment for the parties. The record on appeal is not sufficiently developed for us to make the de novo determination of whether the payments undertaken by the Companies under the Agreement were, as a matter of law, "penalties" within the scope of Article IX, § 7 of our State Constitution. Whether these payments are penalties depends upon whether they were "intended to penalize" the Companies or "imposed to deter future violations and to extract retribution." Mussallam , 321 N.C. at 509, 364 S.E.2d at 366-67 ; Moore , 359 N.C. at 496, 614 S.E.2d at 517.
We reverse the trial court's order, which determined that the payments are not penalties as a matter of law. We remand to the trial court for trial to determine whether the payments in the Agreement were intended to constitute penalties, payment in lieu of penalties, forbearance for potential or future enforcement actions, or were not penalties. The order of the trial court, which granted Defendant's motion for summary judgment, is reversed. This matter is remanded for trial. It is so ordered.
REVERSED AND REMANDED.
Judge BERGER concurs.
Judge BRYANT dissents with separate opinion.