IN THE SUPREME COURT OF NORTH CAROLINA

No. 339A18

Filed 3 April 2020

THE NEW HANOVER COUNTY BOARD OF EDUCATION

v.

JOSH STEIN, in his capacity as Attorney General of the State of North Carolina; and NORTH CAROLINA COASTAL FEDERATION and SOUND RIVERS, INC., Intervenors

Appeal pursuant to N.C.G.S. 7A-30(2) from a divided panel of the Court of Appeals, 820 S.E.2d 89 (N.C. Ct. App. 2018), reversing and remanding an order entered on 12 October 2017 by Judge Paul C. Ridgeway in Superior Court, Wake County. On 30 January 2019, the Supreme Court allowed petitions for discretionary review as to additional issues filed by plaintiff, defendant, and intervenors. Heard in the Supreme Court on 19 November 2019 in session in the Whitted Building in the Town of Hillsborough pursuant to section 18B.8 of Chapter 57 of the 2017 North Carolina Session Laws.

> *Stam Law Firm, PLLC, by R. Daniel Gibson and Paul Stam, for plaintiff-appellee.*
>
> *Joshua H. Stein, Attorney General, by Matthew W. Sawchak, Solicitor General, James W. Doggett, Deputy Solicitor General, and Marc Bernstein, Special Deputy Attorney General, for defendant-appellant Josh Stein.*
>
> *The Southern Environmental Law Center, by Mary Maclean Asbill, Brooks Rainey Pearson, and Blakely E. Hildebrand, for intervenor-appellants North Carolina Coastal Federation and Sound Rivers, Inc.*

*Tharrington Smith, L.L.P., by Lindsay Vance Smith and Deborah R. Stagner; and Allison B. Schafer for North Carolina School Boards Association, amicus curiae.*

ERVIN, Justice.

On 25 July 2000, following a five-year period during which ruptured or flooded hog waste lagoons spilled millions of gallons of waste into North Carolina's waterways, then-Attorney General Michael F. Easley entered into an agreement with Smithfield Foods, Inc., and several of its subsidiaries.[1]  Pursuant to the agreement, Smithfield and its subsidiaries agreed to:

(1) undertake immediate measures for enhanced environmental protection on Company-owned Farms and provide assistance to Contract Farmers in undertaking these same measures;

(2) commit $15 million for the development of Environmentally Superior Technologies for the management of swine waste and to facilitate the development, testing, and evaluation of potential technologies on Company-owned Farms;

(3) install Environmentally Superior Technologies on each Company-owned Farm in North Carolina and provide financial and technical assistance to Contract Farmers for the installation of these technologies;

(4) commit $ 50 million to environmental enhancement activities;

(5) cooperate fully with the Attorney General to ensure compliance with applicable laws, regulations, policies and standards; and

---

[1] The Smithfield subsidiaries that joined in the agreement include Brown's of Carolina, Inc.; Carroll's Foods, Inc.; Murphy Farms, Inc.; Carroll's Foods of Virginia, Inc.; and Quarter M Farms, Inc.

> (6) in cooperation with the Attorney General and all other interested parties, take a leadership role in enhancing the effectiveness of the Albemarle-Pamlico National Estuary Program . . . .

In compliance with the provision of the agreement in which Smithfield and its subsidiaries agreed to commit $50 million to facilitate environmental enhancement activities, the entities in question promised to "pay each year for 25 years an amount equal to one dollar for each hog in which [Smithfield and its subsidiaries] . . . had any financial interest in North Carolina during the previous year, provided . . . that such amount shall not exceed $2 million in any year." The agreement further provided that the monies derived from these payments were to be deposited into an escrow account and "paid to such organizations or trusts as the Attorney General will designate . . . to enhance the environment of the State." In administering the grant program, the Attorney General was entitled to consult with the North Carolina Department of Environmental Quality[2] and "any other groups or individuals he deem[ed] appropriate and [to] appoint any advisory committees he deem[ed] appropriate." Finally, the agreement provided that, "in consideration of the commitments by [Smithfield and its subsidiaries], the Attorney General agrees . . . [t]o use the full power and authority of his office to diligently pursue expeditious implementation of Environmentally Superior Technologies" on farms identified in the

---

[2] At the time that the agreement between the Attorney General and Smithfield and its subsidiaries was entered into, the North Carolina Department of Environmental Quality was known as the North Carolina Department of Environment and Natural Resources.

agreement; to "use his influence to expedite the permitting process"; and to refrain from "undertak[ing] any actions in conflict with" the agreement.

In January 2003, then-Attorney General Roy Cooper established the Environmental Enhancement Grants Program in order to "improve the air, water and land quality of North Carolina by funding environmental projects that address the goals of the agreement." On an annual basis, the grant program accepts applications from government agencies and nonprofit organizations. The submitted applications are reviewed by a panel consisting of representatives from the North Carolina Department of Justice, the Department of Environmental Quality, the North Carolina Department of Natural and Cultural Resources, academic institutions, and conservation-focused nonprofit organizations.

After completing the review process, the panel makes a recommendation to the Attorney General concerning the manner in which the available grant monies should be distributed. A representative of Smithfield and its subsidiaries is entitled to make a separate recommendation concerning the same subject. After considering the recommendation, the Attorney General selects the recipients to be awarded grants and determines the amount, up to a maximum of $500,000, to be awarded to each recipient. In the years since the agreement was executed, the Attorney General has awarded approximately $25 million in grants under the program.

On 18 October 2016, Francis X. De Luca filed a complaint alleging that payments made pursuant to the agreement were actually civil penalties for purposes of article IX, section 7 of the North Carolina Constitution, which states that:

> (a)     Except as provided in subsection (b) of this section, all moneys, stocks, bonds, and other property belonging to a county school fund, and the clear proceeds of all penalties and forfeitures and of all fines collected in the several counties for any breach of the penal laws of the State, shall belong to and remain in the several counties, and shall be faithfully appropriated and used exclusively for maintaining free public schools.

> (b)     The General Assembly may place in a State fund the clear proceeds of all civil penalties, forfeitures, and fines which are collected by State agencies and which belong to the public schools pursuant to subsection (a) of this section. Moneys in such State fund shall be faithfully appropriated by the General Assembly, on a per pupil basis, to the counties, to be used exclusively for maintaining free public schools.

N.C. Const. art. IX, § 7.  As a result, Mr. De Luca sought to have the Attorney General preliminarily and permanently enjoined from distributing monies received pursuant to the agreement to any recipient other than the Civil Penalty and Forfeiture Fund authorized by article IX, section 7(b) and N.C.G.S. §§ 115C-457.1–475.3 and requested that all monies distributed under the grant program within the last three years and all future payments received by the Attorney General be placed into the Civil Penalty and Forfeiture Fund.

On 19 December 2016, the Attorney General filed a motion to dismiss Mr. De Luca's complaint pursuant to Rules 12(b)(2) and 12(b)(6) of the North Carolina Rules

of Civil Procedure. On 25 January 2017, Mr. De Luca filed an amended complaint adding the New Hanover County Board of Education as an additional party plaintiff and substituting current Attorney General Joshua H. Stein, in his official capacity, as the party defendant. The Attorney General then filed an amended dismissal motion. On 14 June 2017, plaintiffs filed a motion seeking the issuance of a preliminary injunction precluding the Attorney General from making any further disbursements under the grant program and requiring the Attorney General to initiate legal proceedings to recoup any funds that had been disbursed in accordance with the grant program since 2014. On 16 June 2017, plaintiffs filed a motion seeking the entry of summary judgment in their favor.

On 27 June 2017, Judge Robert H. Hobgood entered an order denying the Attorney General's amended dismissal motion and directing the Attorney General to answer the amended complaint and an additional order preliminarily enjoining the Attorney General from making disbursements under the agreement pending final resolution of this case. On 17 July 2017, the Attorney General filed an answer to plaintiffs' amended complaint in which he denied the material allegations contained in the amended complaint and asserted a number of affirmative defenses, including laches, waiver, failure of consideration, and equitable estoppel. On 21 July 2017, Judge Hobgood entered an amended preliminary injunction precluding the Attorney General from making any disbursements to recipients relating to grants awarded on or after 30 September 2016. On 21 August 2017, the North Carolina Coastal

Federation and Sound Rivers, Inc., filed a motion seeking leave to intervene in support of the Attorney General and a proposed answer to plaintiffs' amended complaint.

On 22 September 2017, the Attorney General filed a motion seeking the entry of summary judgment in his favor along with a number of attached affidavits from individuals with knowledge about the process that led to the execution of the agreement. In his affidavit, Alan S. Hirsch, a former Director of the Consumer Protection Division of the Department of Justice, stated that he had "led the negotiation and drafting" of the agreement on behalf of the Attorney General. Mr. Hirsch averred that, in his opinion, Smithfield and its subsidiaries had entered into the agreement in order to address a "long running problem of major public concern, to demonstrate good corporate citizenship[,] . . . and to further its public standing by making additional enhancements of North Carolina's environment" given that "[t]he image of the industry was under intense scrutiny." Mr. Hirsch indicated that the agreement was drafted in such a manner as to prevent it from being "read to limit or affect in any way the compliance responsibilities of [the Department of Environmental Quality]"; that the agreement did not "arise from," "address," or "settle" "any actual or alleged violations of law" that Smithfield and its subsidiaries might have committed in the past or might commit in the future or to resolve any cases in which a civil penalty "had been issued or might later be issued" against

Smithfield and its subsidiaries; and that "[n]o penalties or punitive action of any sort was ever discussed or considered" during the negotiations of the agreement.

Daniel C. Oakley, a former Director of the Environmental Division of the Department of Justice, averred in his affidavit that he had been a "primary negotiator" of the agreement. According to Mr. Oakley, "the agreement was not reached in order to settle any cases in which a civil penalty had been assessed by [the Department of Environmental Quality]." In fact, Mr. Oakley "[knew] that no civil penalty being defended by attorneys in [his] [d]ivision was settled, compromised, or in any way impacted by the negotiation or execution of" the agreement. In addition, Mr. Oakley noted that, "[a]lthough there were Notices of Violation and Civil Penalty Assessments issued to various hog farms from 1995 to 2001, any Civil Penalty Assessments were resolved by other means and were not part of the [a]greement at issue in this case." Finally, Mr. Oakley stated that Roy Cooper took office as Attorney General and William G. Ross took office as Secretary of the Department of Environmental Quality in January 2001 and that these two individuals had "ensured that [the Department of Environmental Quality] continued its robust enforcement activity against those of the State's hog farms that were not in compliance with laws and regulations for discharge and non-discharge operations."

Dennis Ramsey, a former Supervisor of the Non-Discharge Branch of the Division of Water Resources at the Department of Environmental Quality, stated in his affidavit that penalties for environmental noncompliance were assessed by the

director of the Division of Water Quality from 1995 until 2001. Mr. Ramsey indicated that he had been responsible for making recommendations to the division director concerning the entities that should be penalized during that period. In addition, Mr. Ramsey averred that he was familiar with the process by which penalty assessments were settled and compromised. Mr. Ramsey stated that he had never been asked to modify any enforcement-related recommendation based upon the agreement and that, "[t]o the best of [his] knowledge," the agreement was "entirely separate from, and in no way related to, any pending or anticipated enforcement action by [the Department of Environmental Quality] against any of the signatories to the [a]greement."

Finally, Christine Lawson, the Program Manager for the Department of Environmental Quality's Animal Feeding Operations Program, executed an affidavit in which she provided information demonstrating that the Department of Environmental Quality had assessed approximately nineteen civil penalties against Smithfield and its subsidiaries during the year preceding the execution of the agreement and the year following the execution of the agreement. According to the information provided by Ms. Lawson, almost half of those penalties were assessed after the execution of the agreement and were based upon notices of violation that had been issued prior to the agreement's execution.

On 25 September 2017, the North Carolina School Boards Association filed a motion seeking leave to file an amicus curiae brief in support of plaintiffs' position.

On 28 September 2017, plaintiffs filed a response in opposition to the intervention petition filed by the Coastal Federation and Sound Rivers and a renewed summary judgment motion in which they cited to (1) records showing a history of environmental violations by Smithfield and its subsidiaries, including several violations that had been noticed in the year prior to the execution of this agreement; (2) a letter written by counsel for Smithfield and its subsidiaries several months after the execution of the agreement stating that "Smithfield [and its subsidiaries] benefit[ ] [from the agreement] because it is an opportunity to avoid enforcement actions by correcting deficiencies before they become enforcement problems" and because it "gives both the State and Smithfield [and its subsidiaries] an opportunity to correct deficiencies that might not be compliance problems now, but could lead to noncompliance in the future if not corrected"; and (3) statements that the Attorney General's Office had made in press releases issued in 2002 and 2013 referring to the agreement as a "settlement." In addition, plaintiffs asserted that the Attorney General lacked the authority to enter into the agreement.

On 12 October 2017, the trial court entered an ordering granting summary judgment in favor of the Attorney General. In reaching this conclusion, the trial court stated that the Attorney General had "presented sufficient evidence to establish its right to judgment as a matter of law that . . . the payments made by [Smithfield and its subsidiaries] under the [agreement] were not 'penalties,' 'forfeitures,' or 'fines' collected for 'any breach of the penal laws of the State' and thus [were] not within the

scope of article IX, sec[tion] 7." According to the trial court, the facts in this case are distinguishable from those at issue in earlier penalty-related cases decided by this Court. The trial court determined that, even if Smithfield and its subsidiaries had entered into the agreement in the hope of avoiding future penalties, this "speculation[,] . . . even if true, would not be sufficient, as a matter of law, to recast the payments made under the [agreement] as 'penalties,' 'forfeitures' or 'fines' collected 'for any breach of the penal laws of the State' " for purposes of article IX, section 7. In other words, the trial court decided that "there is simply no proffer of competent evidence" that the agreement was entered into "to reduce, settle, remit or compromise any threatened or pending violation or to obtain forbearance by [the Department of Environmental Quality] of any anticipated enforcement action." Finally, the trial court noted that plaintiffs had not challenged the Attorney General's constitutional authority to enter into the agreement in the complaint and that, even if plaintiffs had pled such a claim, "it does not logically follow that the payments made under the [agreement], if made pursuant to an agreement in excess of the Attorney General's authority, would fall under the scope of article IX, sec[tion] 7." As a result, the trial court granted the Attorney General's motion for summary judgment, denied plaintiffs' summary judgment motion, dismissed plaintiffs' complaint, and dissolved the preliminary injunction. The trial court entered separate orders allowing the intervention petition filed by the Coastal Federation and Sound Rivers and the filing

of the amicus curiae brief submitted by the School Boards Association. Plaintiffs noted an appeal from the trial court's orders to the Court of Appeals.

In seeking relief from the trial court's orders before the Court of Appeals, plaintiffs argued that the payments made pursuant to the agreement constituted penalties for purposes of article IX, section 7 and that the Attorney General lacked the authority to enter into the agreement unless it was a settlement agreement subject to article IX, section 7. On 4 September 2018, the Court of Appeals filed an opinion reversing the trial court's summary judgment order and remanding this case to the Superior Court, Wake County, for trial.

The Court of Appeals began its analysis by addressing the issue of whether Mr. De Luca had standing to assert a claim against the Attorney General pursuant to article IX, section 7. *De Luca v. Stein*, 820 S.E.2d 89 (N.C. Ct. App. 2018). According to the Court of Appeals, Mr. De Luca had failed to allege that "(1) the payments at issue constitute an illegal or unconstitutional tax; (2) the [a]greement has caused him a personal, direct, and irreparable injury; or, (3) he is a member of a class prejudiced by the [a]greement," *id*. at 95 (citing *Texfi Indus., Inc. v. City of Fayetteville*, 44 N.C. App. 268, 270, 261 S.E.2d 21, 23 (1979), *aff'd*, 301 N.C. 1, 269 S.E.2d 142 (1980)), and had failed to file suit on behalf of any local board of education, make any demand upon an entity with standing to assert a claim such as the one at issue to in this case, or demonstrate that the making of such a demand would be futile. *Id*. On the other hand, the Court of Appeals held that the Board of Education did have standing to

bring an action against the Attorney General pursuant to article IX, section 7 because it was an intended beneficiary of monies that were subject to the relevant constitutional provision and claimed to have been unconstitutionally deprived of monies to which it was entitled. *Id.*

Secondly, the Court of Appeals addressed plaintiffs' contention that payments made pursuant to the agreement constituted penalties for purposes of article IX, section 7. *Id.* at 96. In spite of the fact that "[t]he sworn attestations in the[ ] affidavits [submitted on behalf of the Attorney General] purport [that] the payments [Smithfield and its subsidiaries] undertook to pay under the [a]greement are not punitive because they did not resolve any past, present, or future violations of environmental laws," the Court of Appeals noted that "several factors in the record raise genuine issues of material fact regarding whether the payments were 'intended to penalize' [Smithfield and its subsidiaries] or were 'imposed to deter future violations and to extract retribution from' [Smithfield and its subsidiaries]." *Id.* at 97 (citing *Mussallam v. Mussallam*, 321 N.C. 504, 509, 364 S.E.2d 364, 367 (1988); *N.C. Sch. Bds. Ass'n v. Moore*, 358 N.C. 474, 496, 614 S.E.2d 504, 517 (2005)). More specifically, the Court of Appeals held that the record reflected the existence of genuine issues of material fact concerning whether the agreement had been "instigated at the behest of and initiated by the Attorney General's office" rather than by Smithfield and its subsidiaries or the Department of Environmental Quality and why "the Attorney General retains sole authority over the disbursement of the funds"

if the agreement was "sought or undertaken by [Smithfield and its subsidiaries] to 'demonstrate good corporate citizenship' and to 'improve the image' of the hog farming industry." *Id*. at 97–98. In addition, the Court of Appeals held that there was a genuine issue of material fact concerning whether "the basis, formula, and manner in which the amounts are calculated for [Smithfield and its subsidiaries] to pay each year under the [a]greement [rested more upon] penalties, or a 'head tax' calculation,' rather than [being] 'voluntary contributions' designed to enhance [Smithfield and its subsidiaries'] 'good corporate citizenship,' images or goodwill." *Id*. at 98. In other words, the Court of Appeals questioned why Smithfield and its subsidiaries "would agree to pay $1-per-hog over 25 years as opposed to a specific lump sum or stated contribution" if they were "purely motivated out of a desire to further their corporate image" given that "the per-hog payments specified under the agreement [bore] a resemblance to the per-cigarette payments [that] the General Assembly enacted in the late 1990s to implement the Master Settlement Agreement with tobacco manufacturers to settle lawsuits filed by several states' Attorneys General . . . over healthcare costs stemming from tobacco use." *Id*. Thus, the Court of Appeals held that "a genuine issue of material fact exist[ed concerning] whether the agreement was motivated by a desire by [Smithfield and its subsidiaries] to forestall, or forebear, any potential claims the Attorney General or [the Department of Environmental Quality] could have asserted against them" and "whether [Smithfield and its subsidiaries] would not have agreed to make the payments at issue, but for potential

legal claims, and consequent civil penalties or fines, the Attorney General could have asserted against them." *Id*. at 99.

Similarly, the Court of Appeals held that the timing of enforcement actions taken against Smithfield and its subsidiaries raised a genuine issue of material fact as to whether the payments provided for in the agreement were intended to be punitive in nature. *Id*. In support of its decision, the Court of Appeals noted that, even though the Department of Environmental Quality had assessed nine penalties against Smithfield and its subsidiaries in the fourteen months preceding the signing of the agreement and an additional nine penalties in the eight months following the signing of the agreement, each of the penalties related to "notices of violations accrued or issued by [the Department of Environmental Quality] before the [a]greement was executed." *Id*. (emphasis omitted). In addition, the Court of Appeals determined that the record "d[id] not demonstrate [that the Department of Environmental Quality had] issued any notices of violations to [Smithfield and its subsidiaries] after the [a]greement was signed." *Id*. (emphasis omitted). According to the Court of Appeals, the "apparent discrepancy between the number of notices of violations issued to [Smithfield and its subsidiaries] before and after the [a]greement was signed" raised a genuine issue of material fact concerning whether payments made pursuant to the agreement were made "in lieu of further enforcement actions[ ] and their related civil penalties." *Id*. (emphasis omitted).

Finally, the Court of Appeals held that "the express terms of the [a]greement" evidenced the existence of a genuine issue of material fact concerning whether the payments were intended to "penalize [Smithfield and its subsidiaries] for non-compliance with environmental standards or to induce forbearance on the part of the Attorney General, or [the Department of Environmental Quality], in bringing future enforcement actions." *Id*. at 99–100. In essence, the Court of Appeals asked "why [Smithfield and its subsidiaries] committed to undertake actions to remediate deficient conditions on their farms and operations, install equipment, and additionally pay up to $50 million" for environmental enhancement activities, particularly given that they had "relinquish[ed] any control over to whom and in what amounts the Attorney General distribute[d] the environmental grants." *Id*. at 100 (emphasis omitted). Similarly, the Court of Appeals noted that the Attorney General had described the agreement as a "settlement" in press releases issued in 2002 and 2013 and concluded that these descriptions of the agreement raised a genuine issue of material fact concerning the extent to which the payments provided for in the agreement were intended to be penalties. *Id*. As a result, given that the Court of Appeals determined that the record disclosed the existence of genuine issues of material fact and that "[t]he record . . . is not sufficiently developed for [the Court of Appeals] to make the de novo determination of whether the payments undertaken by [Smithfield and its subsidiaries] under the [a]greement were, as a matter of law, 'penalties' within the scope of [article IX, section 7]," the Court of Appeals reversed

the trial court's order and remanded this case to the Superior Court, Wake County, "to determine whether the payments in the [a]greement were intended to constitute penalties, payment in lieu of penalties, forbearance for potential or future enforcement actions, or were not penalties." *Id.* (emphasis omitted).

In dissenting from the majority's decision, Judge Bryant stated that "the record on appeal is sufficient to make a determination as a matter of law on the question before this Court" and opined that the trial court had not erred by concluding as a matter of law that funds paid pursuant to the agreement were not penalties subject to article IX, section 7. *Id.* at 101. According to Judge Bryant, the majority erroneously created an argument that had not been advanced by any party in the course of concluding that the record disclosed the existence of genuine issues of material fact necessitating a trial on the merits. *Id.* Instead, Judge Bryant "would [have] reach[ed] the main legal issue that is before us—which is the same issue that was before the trial court—[and would have held] that the trial court properly applied the law to the undisputed material facts of this case, and affirm the judgment of the trial court." *Id.*

The Attorney General and the Coastal Federation and Sound Rivers filed notices of appeal seeking review of the Court of Appeals' decision based upon Judge Bryant's dissent. In addition, each party filed a petition seeking discretionary review of additional issues pursuant to N.C.G.S. § 7A-31 to ensure that each of the issues

that had been properly raised in this case before the lower courts were properly before this Court.[3] The Court allowed each party's discretionary review petition.

In seeking to persuade us to overturn the Court of Appeals' decision, the Attorney General[4] argues that, unlike this Court's earlier decisions holding that payments relating to the violation of environmental standards constituted civil penalties for purposes of article IX, section 7, this case did not involve the replacement of, or a reduction in, a previously assessed civil penalty resulting from violations of environmental standards. As a result, the Attorney General contends that the Court of Appeals erred by failing to hold that the payments made in compliance with the agreement fell outside the scope of article IX, section 7.

In addition, the Attorney General contends that the Court of Appeals failed to base its decision upon the analytical framework that appellate courts are required to utilize in evaluating the validity of a trial court's decision to grant or deny a summary judgment motion. The Attorney General argues that, after affidavits tending to show that payments made pursuant to the agreement should not be treated as penalties had been submitted, the burden shifted to plaintiffs to rebut that evidence. *See*

---

[3] Although the Board of Education expressed disagreement with the Court of Appeals' determination that Mr. De Luca lacked standing to challenge the Attorney General's failure to pay monies received under the agreement to the Civil Penalty and Forfeiture Fund, Mr. De Luca refrained from seeking review of the Court of Appeals' standing-related decision because the Board of Education could adequately present plaintiffs' challenge to the agreement before this Court.

[4] The brief filed by the Coastal Federation and Sound Rivers adopted the arguments advanced by the Attorney General.

N.C.G.S. § 1A-1, Rule 56(c), (e); *Charlotte-Mecklenburg Hosp. Auth. v. Talford*, 366 N.C. 43, 50–51, 727 S.E.2d 866, 871–72 (2012) (affirming the trial court's decision to grant summary judgment in the plaintiff's favor in a case in which the plaintiff presented "minimally sufficient" evidence to satisfy its burden and the responsive evidence offered by the defendant "failed to demonstrate that an issue of material fact remained"); *Kidd v. Early*, 289 N.C. 343, 370, 222 S.E.2d 392, 410 (1976) (holding that, where the party seeking summary judgment has produced sufficient evidence to demonstrate that he or she is entitled to prevail as a matter of law, "the rule requires the party opposing a motion for summary judgment—notwithstanding a general denial in his pleadings—to show that he [or she] has, or will have, evidence sufficient to raise an issue of fact"). The Attorney General contends, instead, that the Court of Appeals developed a number of unsupported and speculative theories for the purpose of showing that the record did, in fact, disclose the existence of disputed factual issues. As a result, the Attorney General contends that the Court of Appeals' conclusion that there are genuine issues of material fact should be reversed as well.

In seeking to persuade us to reverse the decision of the Court of Appeals, the Board of Education argues that there is no genuine issue of material fact in this case and that the only question that we should address and resolve is the extent to which a payment made pursuant to the agreement constitutes a settlement of penalty claims, so that the payments required by the agreement must be remitted to the Civil Penalty and Forfeiture Fund. The Board of Education argues that it "provided many

examples of [Smithfield and its subsidiaries'] violations and assessed penalties, press releases, and other documents" that "prove[d that] the [a]greement is a settlement agreement and is subject to article IX, section 7." However, instead of resolving the substantive issue that both parties agree was before the Court of Appeals, the Board of Education contends that the Court of Appeals erred by holding that the parties' subjective intent in entering into the agreement "would be determinative" and by concluding that there existed a genuine issue of material fact as to the parties' subjective intent.

Next, the Board of Education asserts that the agreement is a settlement, with this contention being based upon record evidence that, in its opinion, demonstrates that (1) the payments made pursuant to the agreement were designed to deter noncompliance on the part of Smithfield and its subsidiaries and are, for that reason, the functional equivalent of penalties; (2) the payments made pursuant to the agreement are punitive rather than remedial in nature; and (3) the Attorney General's references to the agreement as a settlement in 2002 and 2013 demonstrate that the Attorney General understood the agreement to be a settlement. As a result, the Board of Education contends that this Court should hold that the payments made pursuant to the agreement constitute penalties subject to article IX, section 7 and should, for that reason, be remitted to the Civil Penalty and Forfeiture Fund.

We review appeals from trial court summary judgment orders using a de novo standard of review. *Daughtridge v. Tanager Land, LLC*, 835 S.E.2d 411, 415 (N.C.

2019) (citing *Ussery v. Branch Banking & Tr. Co.*, 368 N.C. 325, 334–35, 777 S.E.2d 272, 278 (2015)). "The purpose of summary judgment can be summarized as being a device to bring litigation to an early decision on the merits without the delay and expense of a trial where it can be readily demonstrated that no material facts are in issue." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 533, 180 S.E.2d 823, 829 (1971) (citing 2 McIntosh, *N.C. Practice and Procedure* § 1660.5 (2d Ed., Phillips' Supp. 1970); 3 Barron and Holtzoff, *Federal Practice and Procedure* § 1234 (Wright ed., 1958)). Summary judgment is appropriate in two instances: "(a) [t]hose where a claim or defense is utterly baseless in fact, and (b) those where only a question of law on the indisputable facts is in controversy and it can be appropriately decided without full exposure of trial." *Id.*

"Summary judgment is proper if 'there is no genuine issue as to any material fact and . . . any party is entitled to a judgment as a matter of law.'" *Daughtridge*, 835 S.E.2d at 415 (citing N.C.G.S. § 1A-1, Rule 56(c) (2017)). "The movant is entitled to summary judgment . . . when only a question of law arises based on undisputed facts." *Id.* In determining whether the entry of summary judgment is or is not appropriate, the trial court must take "[a]ll facts asserted by the [nonmoving] party . . . as true" and view the evidence "in the light most favorable to that party." *Id.* (quoting *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000)). Summary judgment involves a two-step process: first, "[t]he party moving for summary judgment bears the burden of establishing that there is no triable issue of material

fact," *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002) (citing *Nicholson v. Am. Safety Util. Corp.*, 346 N.C. 767, 774, 488 S.E.2d 240, 244 (1997)), and then, "[o]nce the moving party satisfies these tests, the burden shifts to the nonmoving party to 'produce a forecast of evidence demonstrating that the [nonmoving party] will be able to make out at least a prima facie case at trial.' " *Id.* at 681–82, 565 S.E.2d at 146 (quoting *Collingwood v. Gen. Elec. Real Estate Equities, Inc.*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989)).

As an initial matter, we note that the Board of Education argued, among other things, that the payments contemplated in the agreement could only have been a penalty given that the Attorney General lacked the authority to enter into the agreement unless it involved the settlement of a notice of violation. In support of this assertion, the Board of Education argued that, at the time that the agreement was entered into, the only authority granted to the Attorney General was that delineated in N.C.G.S. §§ 114-1.1 and 114-2, neither of which give the Attorney General the power to enter into an agreement such as the one at issue in this case, and that the agreement must have been a settlement for that reason.[5] The Attorney General, on the other hand, argued that, as the State's chief legal officer, he possessed the common law authority to manage the legal affairs of the State, including the authority to accept gifts on behalf of the State such as the grant funding embodied in

---

[5] As an aside, we note that the Board of Education never argued before this Court that the Attorney General lacked the authority to enter into the agreement at all and, in fact, expressly disclaimed any intention of doing so.

the agreement. Although the question of the extent to which the Attorney General had the authority to enter into the agreement is an interesting one, we do not believe that it is before us in this case.

Generally speaking, the only persons entitled to "call into question the validity of a statute [are those] who have been injuriously affected thereby in their persons, property or constitutional rights." *Piedmont Canteen Serv., Inc. v. Johnson*, 256 N.C. 155, 166, 123 S.E.2d 582, 589 (1962) (citing *Leonard v. Maxwell*, 216 N.C. 89, 98, 3 S.E.2d 316 (1939); and *St. George v. Hardie*, 147 N.C. 88, 98, 60 S.E. 920 (1908)); *see also Mangum v. Raleigh Bd. of Adjustment*, 362 N.C. 640, 642, 669 SE.2d 279, 282 (2008) (stating that "the 'gist of the question of standing' is whether the party seeking relief has 'alleged such a personal stake in the outcome of the controversy as to assure the concrete adverseness which sharpens the presentation[s] of issues upon which the court so largely depends for illumination of difficult constitutional questions' " (quoting *Stanley v. Dep't of Conservation & Dev.*, 284 N.C. 15, 28, 199 S.E.2d 641, 650 (1973))). In this instance, the mere fact that the Attorney General and Smithfield and its subsidiaries entered into the agreement did no harm to the Board of Education in light of the fact that it was not a party to the agreement, did not have any rights under the agreement, and would not be entitled to have any monies paid into the Civil Penalty and Forfeiture Fund in the event that the agreement was determined to be unenforceable. For that reason, while the Board of Education did have standing to assert that the payments made pursuant to the agreement constituted penalties

for purposes of article IX, section 7, it lacks standing to assert that the Attorney General lacked the authority to enter into the agreement at all and appropriately made no such argument.

Moreover, the ultimate issue before us in this case is not whether the Attorney General had the authority to enter into the agreement. Instead, the question that we are called upon to decide in this instance is whether, taking the existence of the agreement as a given, payments made pursuant to the agreement constitute penalties that must be turned over to the Civil Penalty and Forfeiture Fund or something else. As a result, for all of these reasons, we express no opinion concerning the extent, if any, to which the Attorney General had the right to enter into the agreement or what status any relevant party would occupy in the event that the agreement was determined to be invalid.

The first issue that we do have to address is whether, as the Court of Appeals determined, one or more genuine issues of material fact exist in this case or whether this case involves "only a question of law on the indisputable facts . . . in controversy [that] can be appropriately decided without full exposure of trial." *Kessing*, 278 N.C. at 533, 180 S.E.2d at 829. As we have already noted, all of the parties to this case are, and the trial court was, of the opinion that no such factual issue arose upon the present record. Although the Court of Appeals concluded that issues of fact that needed to be resolved at trial existed in this case, each of the allegedly factual issues delineated in the Court of Appeals' opinion focuses upon the subjective intentions

with which either the Attorney General or Smithfield and its subsidiaries acted at the time that the agreement was executed, the purposes that Smithfield and its subsidiaries sought to achieve by entering into the agreement, and other similar questions. We do not believe that any of the "issues" upon which the Court of Appeals' decision was predicated suffice to preclude an award of summary judgment on behalf of one party or the other to this case.

We begin by noting that the Court of Appeals did not point to any conflicts in the evidence about which credibility determinations needed to be made. *See Kessing*, 278 N.C. at 535, 180 S.E.2d at 830. Moreover, none of the parties indicated that additional evidence existed that might shed light upon the substantive legal issue that is in dispute between the parties. On the other hand, a number of the issues that the Court of Appeals believed to require further factual development involve the manner in which the undisputed evidence should be evaluated in light of the applicable legal standard, rather than disputed issues of fact about which further factual development would be appropriate. As this Court has previously stated, "the presence of important or difficult questions of law is no barrier to the granting of summary judgment," *id.* at 534, 180 S.E.2d at 830 (citing *Ammons v. Franklin Life Ins.*, 348 F. 2d 414 (5th Cir. 1965); *Palmer v. Chamberlin*, 191 F.2d 532, 27 A.L.R.2d 416 (5th Cir. 1951); *Crowder v. United States*, 255 F. Supp. 873 (N.D. Cal. 1964), *aff'd*, 362 F.2d 1011 (9th Cir. 1966); 3 Barron and Holtzoff, *supra* § 1234, pp. 126–27 (Wright ed. 1958); 6 *Moore's Federal Practice* § 56.16 (2d ed. 1966)), and the record

suggests that the questions that we have before us in this case are just such issues of law rather than disputed issues of material fact.

Secondly, and perhaps more importantly, the bulk of the "factual" issues upon which the Court of Appeals relied in remanding this case for trial focus upon the subjective intent of the parties at the time that they took certain actions. However, as has already been noted, the principal substantive issue that we are called upon to decide in this case is whether the payments that are received pursuant to the agreement are or are not penalties as that term is used in article IX, section 7. In making that determination, our focus must necessarily be upon what the payments actually are, rather than upon questions such as which party instigated the process that led to the execution of the agreement, why the agreement was structured the way that it was, or what each party subjectively and in isolation thought to be the purpose served by the payments contemplated under the agreement. For that reason, most of the issues of "fact" upon which the Court of Appeals' decision rests are simply irrelevant to the ultimate legal issue that the Court has been called upon to resolve in this case and pose no obstacle to a decision to grant summary judgment in favor of one party or the other. As a result, we hold (1) that the Court of Appeals erred by reversing the trial court's order and remanding this case to the Superior Court, Wake County, for trial on the merits and (2) that this case is ripe for resolution on the merits on the basis of the parties' cross motions for summary judgment.

As we have already noted, article IX, section 7 provides, in pertinent part, that "the clear proceeds of all penalties and forfeitures and of all fines collected in the several counties for any breach of the penal laws of the State, shall belong to and remain in the several counties, and shall be faithfully appropriated and used exclusively for maintaining free public schools." N.C. Const. art. IX, § 7. In making a determination as to whether a particular payment is a penalty for purposes of article IX, section 7, "the label attached to the money is not controlling." *Moore*, 359 N.C. at 487, 614 S.E.2d at 512 (citing *Cauble v. City of Asheville*, 301 N.C. 340, 271 S.E.2d 258 (1980); *State v. Rumfelt*, 241 N.C. 375, 85 S.E.2d 398 (1955); *Bd. of Sch. Dirs. v. City of Asheville*, 128 N.C. 249, 38 S.E. 874 (1901); and *Bd. of Educ. v. Town of Henderson*, 126 N.C. 689, 36 S.E. 158 (1900)). Instead, the "determinative" or "critical" question is whether the alleged " 'civil penalty' is punitive or remedial in nature" or, put another way, "whether the penalty mandated for violation of the statute is imposed as punishment to deter noncompliance or to measure the damages accruing to an individual or class of individuals resulting from the breach." *Id.* at 512–13, 614 S.E.2d at 488 (citing *Remedial, Black's Law Dictionary* (6th ed. 1990)). In applying this basic standard to funds collected relating to environmental enforcement, this Court has held that money paid to support a Supplemental Environmental Project as a full or partial substitute for an environmental noncompliance penalty was a penalty for purposes of article IX, section 7, given that

> [t]he payment would not have been made had [the Department of Environmental Quality] not assessed a civil

> penalty against [the violator] for violating a water quality law. To suggest that the payment was voluntary is euphemistic at best. Moreover, the money paid under the [Supplemental Environmental Project] did not remediate the specific harm or damage caused by the violation even though a nexus may exist between the violation and the program [funded by the payment]. The payment was still punitive in nature. Nor is the nature of the payment by the City of Kinston or any other violator altered by its being made to a third party pursuant to a policy promulgated by [the Department of Environmental Quality] in an attempt to circumvent the statutory and constitutional requirement that the clear proceeds of civil penalties be paid to the Civil Penalty and Forfeiture Fund.

*Id.* at 509, 614 S.E.2d at 525. Similarly, this Court held in *Craven Cty. Bd. of Educ. v. Boyles*, 343 N.C. 87, 92, 468 S.E.2d 50, 53 (1996), that monies paid to settle proceedings initiated for the purpose of enforcing environmental standards constituted penalties subject to article IX, section 7, stating that "it is not determinative that the monies were collected by virtue of a settlement agreement" or that the parties "stated that the payment [was] not [to] be construed as a penalty" given that "[t]he monies were paid to settle the assessments of a penalty for violations of environmental standards." As a result, the ultimate question before this Court is whether the payments made pursuant to the agreement, construed in realistic, rather than nominal terms, were intended to punish Smithfield and its subsidiaries for committing one or more environmental violations or to serve some other purpose.

The language in which the agreement is couched clearly demonstrates that the payments at issue in this case were not intended to punish Smithfield and its subsidiaries for any specific environmental violation or to deter them from

committing any future environmental violation.  On the contrary, the agreement

provides, in pertinent part, that:

> [Smithfield and its subsidiaries] have entered into this
> binding [a]greement freely for the purpose of
> memorializing the commitments they have voluntarily
> agreed to undertake . . . .
>
> [Smithfield and its subsidiaries] acknowledge that the
> Attorney General, in consultation with [the Department of
> Environmental Quality], will undertake a comprehensive
> review of the operation of the swine industry in North
> Carolina to ensure that [Smithfield and its subsidiaries]
> and other integrators and operators of swine facilities are
> taking all appropriate steps, and have adopted compliance
> assurance systems, to ensure that they remain at all times
> in compliance with the law . . . .
>
> Nothing in this [a]greement shall be construed to in any
> way limit State or private enforcement against [Smithfield
> and its subsidiaries] for past, present, or future violations
> of law . . . .  This [a]greement shall not be construed as a
> settlement of any liability of [Smithfield and its
> subsidiaries] for penalties, fines, damages or other liability.
>
> . . . .
>
> Nothing in this [a]greement shall relieve [Smithfield and
> its subsidiaries] of their responsibility to comply with
> applicable law . . . .

Thus, the agreement specifically provides that the commitments made by Smithfield

and its subsidiaries do not effect a settlement of any liability that might arise from

any past environmental violation or have any effect upon any enforcement action that

might be taken by the Department of Environmental Quality in the event that any environmental violation occurs in the future.[6]

Consistently with the general terms in which the agreement is couched, the specific payments at issue here, unlike those that the Court deemed to be penalties in *Moore* and *Boyles*, do not stem from an enforcement proceeding in which the Department of Environmental Quality or some other state agency attempted to assess a penalty for the purpose of punishing a past environmental violation or deterring future violations before accepting a payment from the alleged violator to either an agency of the State or some other entity in full or partial satisfaction of a civil penalty that would have otherwise become due and owing. On the contrary, the agreement was not, by its own terms, tied to any particular violations of the environmental laws. In addition, the undisputed evidence forecast by the Attorney General tends to show that no existing settlement actions were disposed of as a result of the decision of Smithfield and its subsidiaries to enter into the agreement and that

---

[6] The fact that sections III.A.1.b and III.A.1.d of the agreement provide that Smithfield and its subsidiaries will submit plans that "identif[y] those Company-owned Farms that have the potential to adversely impact water quality due to deficient site conditions or operating practices and a description (together with expeditious implementation schedules) of proposed measures to correct such deficiencies or operating practices" and "identif[y] all abandoned lagoons on Company-owned Farms and a description (together with expeditious implementation schedules) of proposed measures for closure of the lagoons on Company-owned Farms in accordance with current NRCS and [Department of Environmental Quality] standards and consistent with [the Department of Environmental Quality's] most current priority list" does nothing to undercut the conclusion set out in the text. Simply put, nothing in the record shows that the actions delineated in these provisions of the agreement, which are explicitly stated to be remedial in nature, involve the sanctioning of violations of legally-enforceable environmental standards.

no State agency or official, including the Department of Environmental Quality or the Attorney General, has refrained from seeking the imposition of a penalty for any environmental violation that occurred after the date upon which the agreement was entered into. In light of the language in which the agreement is couched, there is no evidence in the present record tending to show that Smithfield and its subsidiaries made the payments contemplated under the agreement in lieu of paying a penalty for specific violations of an environmental standard.

In seeking to persuade us that the payments contemplated under the agreement were, in fact, the functional equivalent of a civil penalty, the Board of Education advances a number of arguments, none of which we find persuasive. For example, the Board of Education argues that an examination of the Department of Environmental Quality's enforcement records relating to Smithfield and its subsidiaries indicates that the Department of Environmental Quality began "going light" on them after the agreement was entered into and that this information permits a reasonable inference that the agreement did, in fact, serve as a substitute for penalties that would have been assessed against Smithfield and its subsidiaries. However, given that the Board of Education has not shown what level of enforcement would have been appropriate in light of the level of compliance with the environmental laws exhibited by Smithfield and its subsidiaries after the date upon which the agreement was executed, we are unable to say that the Board of Education's argument is anything more than an exercise in speculation or conjecture.

*See Dickens v. Puryear*, 302 N.C. 437, 457, 276 S.E.2d 325, 337 (1981) (stating that, where the plaintiff "in essence relies on the allegations . . . in his complaint and possible speculation or conjecture[,]" such information "is not enough to survive [the defendant's] motion for summary judgment"). Such a deficiency in the record precludes reliance upon rhetorical questions asking what considerations might have motivated Smithfield and its subsidiaries to enter into the agreement if it was not intended to avoid or lessen future penalty payments.

Similarly, the Board of Education directs our attention to portions of a letter written by counsel for Smithfield and its subsidiaries following the execution of the agreement in which the benefits of the agreement to Smithfield and its subsidiaries are said to include the ability to proactively "correct[ ] deficiencies *before* they become enforcement problems." However, instead of suggesting that the agreement settled future enforcement actions by providing for a payment that constituted the functional equivalent of a penalty, the relevant portion of counsel's letter actually demonstrates that the agreement did not address or settle any environmental violations that had previously occurred and that the agreement was intended, instead, to help correct deficiencies that could lead to future enforcement actions. In other words, counsel's letter described the agreement as having a remedial and preventative, rather than a punitive, purpose.

In a related argument, the Board of Education directs our attention to the fact that the Attorney General referred to the agreement in two different press releases

as a "settlement" and argues that the Attorney General's settlement authority is limited to compromising an enforcement action. However, we believe that the Board of Education puts more weight on this argument than it will reasonably bear. As we have previously stated, "it is neither 'the label attached to the money' nor 'the [collection] method employed,' but 'the nature of the offense committed' that determines whether the payment constitutes a penalty." *Boyles*, 343 N.C. at 92, 468 S.E.2d at 53 (quoting *Cauble*, 301 N.C. at 344, 271 S.E.2d at 260); *see also Moore*, 359 N.C. at 510, 614 S.E.2d at 526 (stating that "the terms and descriptions [that the Department of Environmental Quality] and a violator use to refer to a payment are not determinative" (citing *Boyles*, 343 N.C. at 92, 468 S.E.2d at 53)). Regardless of whether the agreement represents a "settlement" or something else entirely, the relevant issue for purposes of this case is whether the payments provided for in the agreement constitute the functional equivalent of penalties, rather than the way in which the parties characterize them. In other words, the relevant issue for purposes of this case not whether the agreement involves a gift or a settlement; instead, the relevant issue is whether the payments at issue here constitute penalties. And, as we have previously indicated, the record does not contain any evidence tending to show that the payments made pursuant to the agreement have served to either settle any particular enforcement action or as the functional equivalent of a penalty and does contain a considerable amount of evidence pointing in the opposite direction.

Finally, the Board of Education's assertion that Smithfield and its subsidiaries had no incentive to enter into the agreement if acting in that fashion did not somehow offset some current or future liability rests upon a misunderstanding of the applicable legal test, which focuses upon the purpose for which the relevant payment was made rather than the subjective intentions of the persons or entities involved in the making of that payment. In order for a particular payment to constitute a "penalty" as that term is used in article IX, section 7, both the payor and the regulatory agency must understand that the payment in question is the functional equivalent of a penalty to which the payor would be exposed as a result of an environmental violation. In the absence of an express or implied agreement on the part of the regulatory agency that the payment will, in fact, be treated in that fashion, the mere fact that the payor subjectively hopes that its actions will have the effect of reducing the severity with which the regulatory agency views any violation that it might commit in the future is simply not sufficient to convert that payment into a penalty for purposes of article IX, section 7.

Thus, for all of these reasons, we hold that the Court of Appeals erred by determining that the record disclosed the existence of genuine issues of material fact that precluded the entry of summary judgment in favor of either party and remanding this case to the Superior Court, Wake County, for a trial on the merits. In addition, we hold that the trial court correctly decided to enter summary judgment in favor of the Attorney General on the grounds that the payments contemplated by the

agreement did not constitute penalties for purposes of article IX, section 7.[7]  As a result, we reverse the decision of the Court of Appeals and remand this case to the Court of Appeals for any additional proceedings not inconsistent with this opinion.[8]

REVERSED AND REMANDED.

---

[7] Any argument that the agreement is invalid because it rests upon a violation of article I, section 6 of the North Carolina Constitution (providing that "[t]he legislative, executive, and judicial powers of the State government shall be forever separate and distinct from each other") by impermissibly infringing upon the General Assembly's constitutional taxing authority is not properly before this Court.  No such arguments were made before the trial court, the Court of Appeals, or this Court, and we decline to deviate from our long-standing refusal to address constitutional issues that were not presented to the lower court by reaching out to decide that issue in this case.  *Dennis v. Duke Power Co.*, 341 N.C. 91, 103, 459 S.E.2d 707, 715 (1995) (stating that "[i]t is a well[-]established rule of this Court that it will not decide a constitutional question which was not raised or considered in the court below" (quoting *Johnson v. Highway Commission*, 259 N.C. 371, 373, 130 S.E.2d 544, 546 (1963))).  As a result, we express no opinion concerning the merits of any separation of powers challenge that might be advanced in opposition to the lawfulness of the agreement that is before us in this case.

[8] On 18 November 2019, Governor Roy Cooper signed 2019 N.C. Sess. Laws 250 into law.  The relevant session law amended N.C.G.S. § 147-76.1 so as to provide, in pertinent part, that, "[e]xcept as otherwise specifically provided by law, all funds received by the State, including cash gifts and donations, shall be deposited into the State treasury," N.C.G.S. § 147-76.1(b), and that, "[e]xcept as otherwise provided by subsection (b) of this section, the terms of an instrument evidencing a cash gift or donation are a binding obligation of the State[, with] [n]othing in this section [to] be construed to supersede, or authorize a deviation from the terms of an instrument evidencing a gift or donation setting forth the purpose for which the funds may be used."  N.C.G.S. § 147-76.1(c).  Although 2019 N.C. Sess. Laws 250, § 5.7.(c) provided that newly-enacted N.C.G.S. § 147-76.1 became effective on 1 July 2019, and would be applicable to all funds received on or after that date, the parties agreed that the provisions of newly-enacted N.C.G.S. § 147-76.1 have no bearing upon the proper resolution of this case.  As a result, we will refrain from attempting to construe N.C.G.S. § 147-76.1 or to apply its provisions to the facts of this case.

Justice NEWBY dissenting.

According to the Attorney General, the multi-million-dollar agreement reached with Smithfield is not a settlement, even though it references regulatory deficiencies for which the State presumably could have held Smithfield responsible. We are asked to believe instead that Smithfield regarded its potential payments totaling $50 million over twenty-five years as nothing more than a gift that the Attorney General would use in his sole discretion to fund grants to environmental groups. The undisputed facts of this case, especially when viewed in light of controlling legal precedent, reveal that the $50 million is not a gift. The agreement is a settlement, drafted to circumvent the North Carolina Constitution's requirement that the money proceeds of fines and penalties go to the public schools. Furthermore, if the agreement is not a settlement, it violates our state constitution's separation-of-powers principle by invading the General Assembly's policymaking and budgetary prerogatives in a way that invites other constitutional officers to create and manage programs funded by "gifts" received from the very companies they police. Because this agreement is a settlement, not a gift, I respectfully dissent.

The circumstances leading to this agreement aid in understanding its true nature. Severe flooding of swine farms in the 1990s brought about environmental challenges. Ruptured and flooded swine waste lagoons spilled millions of gallons of waste into the State's waterways and groundwater. Smithfield was among the

largest companies in the swine industry; in the late 1990s, it received at least forty-five notices of violation of environmental laws and regulations from the Department of Environmental Quality (DEQ, formerly the Department of Environment and Natural Resources).

On 25 July 2000 then-Attorney General Michael F. Easley made an agreement with Smithfield and some of its subsidiaries (collectively, Smithfield) in which Smithfield agreed to, among other things, immediately take measures to enhance environmental protection on its farms, commit $15 million towards the development of advanced technologies for dealing with environmental hazards like swine waste, install these technologies on its farms, and cooperate with the Attorney General to ensure compliance with environmental laws. The agreement established a timeline for Smithfield to address many of its environmental issues. For example, it allowed Smithfield until 15 October 2000 to submit a plan to correct "deficient site conditions or operating practices" at some of its farms and until 15 December 2000 to submit a plan to shut down its abandoned lagoons. Most significantly to this case, Smithfield promised to contribute up to $50 million over twenty-five years towards "environmental enhancement" activities administered at the discretion of the Attorney General. After the agreement was made, the Attorney General's office referred to it as a "settlement" multiple times in press releases.

The Attorney General, in his discretion, administers the $50 million fund as

follows: Smithfield deposits the payments for environmental enhancement activities in an escrow account, from which funds are then paid out to organizations, at the direction of the Attorney General, for environmental projects. The Attorney General created the "Environmental Enhancement Grants Program." Governmental and nonprofit entities may apply for grants from the program and a panel made up of individuals from the Department of Justice, DEQ, the Department of Natural and Cultural Resources, and certain nongovernmental entities reviews the applications. The panel, as well as a Smithfield representative, recommends to the Attorney General how grants should be dispersed, but the Attorney General makes the ultimate decision. Since the agreement was made, the Attorney General has awarded more than $25 million in grants through this program. The program continues to operate today, with millions of dollars more to be distributed.

The majority decides that the $50 million Smithfield promised to pay for the Attorney General's grant program is not a settlement payment for two primary reasons. First, one section of the agreement provides that the agreement has no effect on the Attorney General's ability to resolve current enforcement actions or bring new ones. Second, there is no evidence that Smithfield obtained the dismissal of any outstanding enforcement action brought against it as a result of the agreement. Certainly these considerations should factor into the analysis of the agreement's nature, but they do not capture the entire story.

The agreement must be viewed as a whole for its true effect, notwithstanding how the agreement's isolated provisions or the agreement's parties characterize it. *See Cauble v. City of Asheville*, 301 N.C. 340, 344, 271 S.E.2d 258, 260 (1980) (explaining that, as to the question about whether funds are derived from penalties and so reserved for education, this Court has "often stated that the label attached to the money does not control"). When viewed in its entirety, the agreement reveals that Smithfield promised millions of dollars to the Attorney General in exchange for leniency in enforcing State environmental laws and regulations. The $50 million is therefore a payment in lieu of penalties, subject to Article IX, Section 7's requirement that the funds go to the State's public schools. *See* N.C. Const. art. IX, § 7.[1] The agreement's provision explaining that it should not be viewed in this way does not change the agreement's substance.

This case is not unique. Indeed, our case law applying Article IX, Section 7 has developed over time in response to attempts by state and local governmental entities to circumvent the State constitutional requirement that proceeds from fines or penalties inure to benefit of public schools. In *Cauble* citizens of the City of Asheville paid funds for parking citations they received from the City. 301 N.C. at 342, 271 S.E.2d at 259. The City argued that the funds were not fines subject to

---

[1] Article IX, Section 7 of the North Carolina Constitution declares that "the clear proceeds of all penalties and forfeitures and of all fines collected in the several counties for any breach of the penal laws of the State, . . . shall be faithfully appropriated and used exclusively for maintaining free public schools."

Article IX, Section 7 because, among other things, the citizens paid the funds "voluntarily" after receiving a citation; they were not assessed after a criminal conviction. *Id.* at 343–44, 271 S.E.2d at 260. The Court disagreed and held that the funds were subject to Article IX, Section 7. *Id.* at 345, 271 S.E.2d at 261. The central question in cases like that one, the Court said, is not "whether the monies are denominated 'fines' or 'penalties' " because "the label attached to the money does not control." *Id.* at 344, 271 S.E.2d at 260. It explained that "[t]he crux of the distinction lies in the nature of the offense committed, and not in the method employed by the municipality to collect fines for commission of the offense." *Id.*

In response to the Court's ruling in *Cauble*, the Department of Environment, Health and Natural Resources (DEHNR) ventured a different argument in *Craven County Board of Education v. Boyles*, 343 N.C. 87, 468 S.E.2d 50 (1996). In that case, DEHNR assessed a penalty against a company for violating air pollution standards. *Id.* at 88, 468 S.E.2d at 51. DEHNR and the company eventually made a settlement agreement under which payments were not to "be construed as forfeitures, fines, penalties, or payments in lieu thereof." *Id.* at 89, 468 S.E.2d at 51. Despite the language of the agreement, the Court explained that because the payments arose from an environmental enforcement action against the payor, the funds were proceeds from penalties and thus subject to Article IX, Section 7. *Id.* at 92, 468 S.E.2d at 53.

In due course, the Department of Environment and Natural Resources (DENR), DEHNR's successor, tried another argument to avoid Article IX, Section 7 in *North Carolina School Boards Association v. Moore*, 359 N.C. 474, 614 S.E.2d 504 (2005). In that case, DENR assessed a penalty against the City of Kinston, but eventually remitted the penalty altogether. *See id.* at 509–10, 614 S.E.2d at 525. Instead, the parties made an agreement under which the City of Kinston paid money to the State's "Supplemental Environmental Project." *Id.* at 508, 614 S.E.2d at 524–25. Nonetheless, the Court held the payment was a settlement of penalties despite the State's assertion that the payments were voluntary and remedial in nature. *Id.* at 508–10, 614 S.E.2d at 524–26. Because the payment would not have been made had DENR not assessed a penalty against the City of Kinston, the Court stated it would be "euphemistic at best" to say the payment was voluntary. *Id.* at 509, 614 S.E.2d at 525.

This case represents perhaps the most creative effort yet to avoid Article IX, Section 7. The Attorney General argues that the agreement at issue falls outside that provision because it did not resolve any outstanding civil penalties assessed against Smithfield. Though the agreement resolved no such penalties, a fair reading of the document shows that, as consideration for its $50 million promise, Smithfield received time to correct regulatory deficiencies that otherwise could have resulted in the imposition of further penalties. For example, in subsection III(A)(1)(b), the agreement gave Smithfield until 15 October 2000 to submit a plan to correct

"deficient site conditions or operating practices" at some of its farms. "Deficient" sites indicate that those sites fell below the lawful standards. So, the agreement appears to have allowed Smithfield nearly three months to submit a plan to correct conditions for which the Attorney General presumably could have immediately brought an enforcement action. Similarly, subsection III(A)(1)(d) of the agreement allowed Smithfield until 15 December 2000 to submit a plan to shut down its abandoned lagoons; it thus granted Smithfield nearly five months to submit a plan to correct conditions for which the Attorney General could bring an enforcement action immediately, assuming the abandoned lagoons presented an unlawful environmental hazard.[2]

There simply is no good reason to believe that Smithfield would have entered into the agreement had the deficiency provisions not been part of the document. In support of his position, the Attorney General points to language near the end of the document which states that the agreement should not be interpreted to limit State enforcement "for past, present, or future violations of law . . . ." That language is no more dispositive than the provision in the *Boyles* settlement agreement that described the company's settlement payments as something other than a fine,

---

[2] Counsel for the Attorney General admitted at oral argument that much of the agreement functioned to help Smithfield come into compliance with State law. This statement presumes that some of Smithfield's facilities violated the law at the time the agreement was made. The agreement thus secured for Smithfield an alternative to the standard enforcement process.

penalty, or forfeiture. As this Court did in *Boyles*, we should refuse to take at face value a single settlement provision that is at odds with the plain intent of the parties and that appears designed to deny the public schools funds owed to them under Article IX, Section 7.

The Attorney General's effort to portray Smithfield's payments as a gift creates a Catch-22. At oral argument, when asked how the section under which Smithfield promised to pay money is enforceable, the Attorney General asserted that the funds are an enforceable charitable gift. It is, however, a longstanding principle of contract law that a gift is not generally enforceable unless it is given for consideration. *See, e.g.*, *Picot v. Sanderson*, 12 N.C. (1 Dev.) 309, 309 (1827) (explaining that a transaction was "a mere contract or agreement to give, which, being without consideration, cannot be enforced"). In other words, a "gift" is enforceable when the "giver" gets something in return—that is, when the gift is not truly a gift at all. If the payments really are a gift, they are unenforceable. If they are not a gift, then they are part of a settlement agreement involving the enforcement of state law and therefore subject to Article IX, Section 7.

Because the best reading of the whole agreement shows that Smithfield secured favor from the Attorney General regarding Smithfield's noncompliant practices, the funds promised by Smithfield are not a gift. It does not matter that no outstanding enforcement action was dismissed by the Attorney General because of

the agreement. The function of the agreement viewed objectively is to secure

leniency by the regulators in favor of the regulated party, Smithfield. Because of the

potential of future enforcement actions against Smithfield, it is, like it was in

*Moore*, "euphemistic at best" to say that Smithfield voluntarily made a gift out of

pure good will. The agreement appears artfully drafted based on this Court's

precedent on penalties, but the substance of the agreement shows through

nonetheless. Given the binary choice presented in this case—a gift or a settlement

in lieu of penalties—the funds should be classified as a settlement and thus directed

to the Civil Penalties and Forfeiture Fund. This classification is consistent with how

the Attorney General's office has characterized the agreement.

Indeed, if the agreement with Smithfield is *not* a settlement, the Attorney

General lacked authority to make the agreement. The majority states that this

Court need not resolve the question of the Attorney General's authority in this case.

I disagree.[3] The issue is not only critically important to the State's public interest

---

[3] The majority asserts that plaintiff does not have standing to challenge the Attorney General's authority to make the agreement because the existence of the agreement does not harm plaintiff.

First, I do not think standing is a bar to considering this issue because plaintiff does not actually claim the agreement is invalid; it simply argues the agreed upon payments must be a settlement if the agreement is to be considered valid. This argument is not a separate claim for which a plaintiff must show standing. It is an additional argument supporting the central claim, which plaintiff has standing to assert.

Second, as to the substance of the standing issue, generally, any person may bring an action alleging a separation of powers violation if they can show any injury, even if the injury is the same as that suffered by the rest of the public. We have recognized causes of action arising directly under the North Carolina Constitution to vindicate rights secured by

and jurisprudence, but plaintiff also adequately presented it, arguing that the agreement *must* involve settlement in lieu of penalties if the agreement is to be a valid exercise of the Attorney General's powers.

The General Assembly has decided that the Attorney General should have all the "powers of the Attorney General that existed at the common law, *that are not repugnant to or inconsistent with the Constitution* or laws of North Carolina." N.C.G.S. § 114-1.1 (2019) (emphasis added). Specifically, it gave the Attorney General the duty to represent the interests of the State in legal proceedings,

---

the Declaration of Rights. *Corum v. Univ. of N.C.*, 330 N.C. 761, 783, 413 S.E.2d 276, 290, *cert. denied*, 506 U.S. 985, 113 S. Ct. 493, 121 L. Ed. 2d 431 (1992). The Declaration of Rights provides, among many other things, that "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. In this case, plaintiff may have been injured by a separation of powers violation by the Attorney General because one conceivable result of the Attorney General's actions is that money that could have been extracted as a penalty, and so directed to supporting education, is instead extracted as a "gift" for environmental enhancement.

This Court should consider the Attorney General's authority in this case. The result of the majority's decision that the agreement does not involve settlement payments in lieu of penalties means that both the agreement and the Attorney General's grant program remain intact and active. The Court thus allows a potentially invalid exercise of governmental power to go unchecked indefinitely. Furthermore, if, as the majority says, these payments are not in settlement of any wrongdoing, past or future, then what is the true nature of the agreement? The agreement at least appears to involve the Attorney General accepting gratuitous payments from entities against which the Attorney General should be enforcing regulations. Can a regulated party give gifts to the regulator without the public seeing the payments as being *for something*? By upholding such a scheme, the majority invites mischief, and the public has an interest in curtailing such mischief. In addition, Smithfield will continue to pay millions into the fund for at least the next five years. Because of the agreement, these substantial funds go into the Attorney General's preferred grant program rather than into any other public fund. The public thus has an interest in the extent of the Attorney General's powers. Because the Attorney General's authority and the nature of this State's separation of powers principle are critical to the public interest and to the State's jurisprudence, this Court should address those issues now.

N.C.G.S. § 114-2 (2019), and authority regarding settlements to which the State is a party, N.C.G.S. § 114-2.1, -2.4 (2019). The Attorney General thus appears to have the authority to settle legal claims that the State may have against private parties, or that private parties may have against the State.

The Attorney General's central argument in this case, however, is that the agreement is not a settlement. If that is true, as the majority concludes, then the Attorney General must find another basis for his authority to make such an agreement.

The Attorney General argues that he has special authority to make the agreement because he is the State's "chief legal advisor," and he has the authority to accept gifts on the State's behalf. The title of "chief legal advisor," he says, gives him the authority to manage all the State's legal affairs, which is not limited to litigation. Specifically, he claims, the Attorney General has "plenary authority to act in the interests of the public, including non-litigation efforts 'to enforce the state's statutes.'" (quoting 7 Am Jur. 2d *Attorney General* § 5, at 10 (2017)).

It is simply incorrect that the Attorney General has "plenary authority to act in the interests of the public." The separation of powers principle of the North Carolina Constitution makes that clear. The Attorney General should act in the public interest, but he may not exercise legislative power to do so. And even if the Attorney General has the power to engage in "non-litigation efforts to enforce the

state's statutes," that power is not broad enough to vindicate his actions here if the payments are not a settlement in lieu of penalties. Under the majority's and the Attorney General's view, neither the agreement nor the grant program "enforces" any State statute. The Attorney General in fact argues that the agreement was not a penalty or settlement resulting from any violation of the law. It is, instead, part of a policy initiative to conserve the State's natural environment. The initiative may be commendable, but it does not enforce the State's laws. If the agreement does not involve settlement of penalties, it involves legislative policy considerations, a role constitutionally reserved for the General Assembly.

Searching for statutory authority, the Attorney General also argues he has power to "accept gifts on behalf of the State" under N.C.G.S. § 138A-32(f)(5) (2019). Obviously intended as an anti-corruption measure, section 138A-32 imposes restrictions on the solicitation and receipt of gifts by certain state officials and employees. Subsection (f)(5) merely states that the statute's restrictions do not apply in the case of gifts "accepted on behalf of the State for use by the State or for the benefit of the State." The best reading of this provision is that, *if* a governmental official may otherwise accept a gift for the State, section 138A-32 does not prohibit the official from doing so. Subsection (f)(5) does not give the Attorney General or other officials authority they would not otherwise have to accept gifts on the State's behalf.

Moreover, under the agreement and grant program, the Attorney General does not simply accept the funds on the State's behalf, he accepts them for his separate fund, and decides precisely how the money should be used. He, in accordance with the agreement, has decided that the funds should be deposited into a specific escrow account, and he has the final say about who receives grants from that fund. The purpose of subsection (f)(5) is to enable public servants, legislators, or legislative employees to accept gifts for the good of the State without violating ethical rules. The General Assembly, in passing that provision, could not have intended those officials and employees to have the authority to unilaterally decide exactly how the State's gift should be used. That is a strikingly broad power which falls squarely within the General Assembly's policymaking purview alone.

Without a specific statutory provision to grant the Attorney General the authority to fund and establish the grant program, the actions of the Attorney General in this case violate the separation of powers principle as well. The North Carolina Constitution provides that "[t]he legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other." N.C. Const. art. I, § 6. The legislative power belongs to the General Assembly. N.C. Const. art. II, § 1 ("The legislative power of the State shall be vested in the General Assembly . . . ."). No governmental entity other than the General Assembly may exercise a power that is uniquely legislative. Any usurpation of the legislative power by the executive branch, regardless of intent, is an exercise of

-13-

powers in violation of the North Carolina Constitution.

By entering into this agreement and creating and operating the grant program the Attorney General has unconstitutionally exercised legislative power. The levying of funds received from private entities is a quintessentially legislative power. References to such power in the North Carolina Constitution refer to powers, or limitations of power, of the General Assembly. *See, e.g.,* N.C. Const. art. II, § 24(1)(k); N.C. Const. art. V, §§ 1, 2, and 5. The Constitution does not grant any similar power to the Attorney General or any other executive branch member. In fact, the Constitution specifically provides that the *General Assembly* may pass laws to allow other entities to appropriate funds for public purposes. *See* N.C. Const. art. V, § 7. Thus, any executive action extracting funds from private entities violates the separation of powers principle of this State unless authorized by the General Assembly. The Attorney General's agreement is unconstitutional if the payments constitute a gift instead of a settlement. The entering of the agreement and operating the grant program cannot, then, fall under the Attorney General's power, which extends only to those actions which are not "repugnant to or inconsistent with the Constitution or laws of North Carolina." N.C.G.S. § 114-1.1.

Under the Attorney General's argument, every Council of State member could "encourage" "gifts" from those entities that they regulate and redirect those gifts to each member's preferred recipients. In doing so, each member could

effectively "tax" the regulated entities to fund the member's own policy initiatives, thereby circumventing the General Assembly. This usurpation of legislative authority would clearly be unconstitutional. Moreover, such governmental actions could suggest impropriety, inviting the onlooking public to question whether those regulated entities that participate in the "gift" programs sponsored by regulators will be treated the same as those that do not.

The Attorney General's agreement with Smithfield is a settlement for purposes of Article IX, Section 7. The public schools are therefore entitled to the clear proceeds of Smithfield's settlement payments. If, as the Attorney General insists, the agreement is not a settlement, it constitutes an unauthorized and unconstitutional usurpation of powers that properly belong to the legislature. I therefore disagree with the majority's decision to let the agreement stand.

I respectfully dissent.